WM. T. THOMPSON CO., a Missouri corporation, Plaintiff,

v.

GENERAL NUTRITION CORPORATION, INC., a Pennsylvania corporation, dba GNC and General Nutrition Center, Inc., a subsidiary of General Nutrition Corporation, a Pennsylvania corporation, Defendants.

GENERAL NUTRITION CORPORATION, INC., et al., Plaintiffs,

v.

WM. T. THOMPSON CO., a Missouri corporation, Defendant.

Nos. CV 78–3206–CHH, CV 78–3891–CHH.

United States District Court, C.D. California.

Sept. 7, 1984.

As Amended Sept. 28, 1984.

See also, 3 Cir., 671 F.2d 100.

Gibson, Dunn & Crutcher, John J. Hanson, Don Howarth, Peter Sullivan, Randolph P. Sinnott, Los Angeles, Cal., Berkman, Ruslander, Pohl, Lieber & Engel, Michael D. Fox, John P. Edgar, Gary L. Goldberg, Pittsburgh, Pa., for General Nutrition Corp. and General Nutrition Center, Inc.

Maxwell M. Blecher, Les J. Weinstein, Robert G. Badal, Scott P. Cooper, Blecher, Collins & Weinstein, Los Angeles, Cal., Davis & Davis, Beverly Hills, Cal., for Wm. T. Thompson Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CYNTHIA HOLCOMB HALL, District Judge.

These actions are before the Court on the motions of General Nutrition Corporation,

Inc., and General Nutrition Center, Inc. (collectively referred to as "GNC"), to review the orders of the Honorable Parks Stillwell, Special Master, imposing monetary sanctions upon GNC and its counsel, and on the motions of Wm. T. Thompson Company ("Thompson") for action on the Special Master's recommendation that the sanctions of default and dismissal be imposed against GNC for discovery abuse. Upon consideration of the record of the proceedings before the Special Master and the points and authorities submitted by the parties and counsel, the Court has, this date, entered orders affirming the Special Master's orders of monetary sanctions against GNC and adopting the Special Master's recommendations that GNC's answer be stricken, and default entered, in case No. CV 78–3206 CHH, and that GNC's complaint be dismissed in case No. CV 78–3891 CHH. These orders are based upon the reasons set forth in these Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. GNC operates the nation's largest chain of health food and health products stores. For many years preceding this litigation, GNC stores sold vitamins manufactured by Thompson, along with competing "national brand" vitamins and GNC's private label vitamins. In May of 1978, GNC commenced a "national brands" sales campaign, featuring extensive newspaper advertisements stating that its national brand vitamins, including Thompson's, were on sale at 20 percent off. Thompson subsequently concluded that GNC's advertisements were false and misleading on a variety of grounds, chief among them the charge that many GNC stores maintained inadequate stocks of Thompson products to meet expected customer demand. By letter dated July 28, 1978, counsel for Thompson notified GNC that Thompson was terminating sales of its products, on the ground that GNC's stores "either do not have the products in stock, have wholly inadequate inventory and/or outdated or reduced potency merchandise available for sale...." Thompson further charged that

GNC was engaging in "bait and switch" advertising, using Thompson's products as the "bait," and invited GNC to immediately conduct a shelf inventory to determine for itself the accuracy of Thompson's allegations.

2. On August 17, 1978, Thompson filed its complaint in case No. CV 78–3206, asserting that GNC's advertising practices violated federal antitrust statutes and state law.

3. On August 18, 1978, GNC filed suit against Thompson in the United States District Court for the Western District of Pennsylvania alleging essentially that Thompson had participated in an unlawful conspiracy to restrain trade in violation of the federal antitrust laws by suspending sales of its products to GNC. (*"General Nutrition Corporation, etc. v. Wm. T. Thompson Co.,* Civil Action No. 78–911").

4. The litigation referred to in paragraph 3 above was transferred to this Court on October 2, 1978, and assigned No. CV 78–3891 for identification purposes.

5. In each action, Thompson served discovery upon GNC in August and September, 1978 within a few weeks after the filing of each action. In No. CV 78–3206, Thompson served its initial Request For the Production Of Documents on August 21, 1978, its First Interrogatories on August 23, 1978, and Notices of Depositions accompanied by subpenas duces tecum to GNC directors and officers on August 25, 1978. In *General Nutrition Corporation, etc. v. Wm. T. Thompson Co.,* Civil Action No. 78–911, Thompson filed its Notices of Depositions and Requests for the Production of Documents to GNC directors and officers on September 13, 1978.

6. Thereafter, Thompson brought on a Motion For Preliminary Injunction pursuant to Rule 65, Federal Rules of Civil Procedure, which was served upon GNC along with accompanying points and authorities and other supporting affidavits and papers, on September 15, 1978. By this motion, Thompson sought to enjoin GNC from advertising Thompson products for which it

did not have adequate inventories or supplies. Thompson's supporting and supplemental papers contained, among other things, a study and sworn findings by its retained consultant, Dr. Donald E. Vinson, in which that consultant had compared statistical samples of inventories of products in GNC stores with GNC's advertising claims and concluded that such claims were erroneous, false and deceptive. GNC opposed Thompson's preliminary injunction motion by alleging, *inter alia*, that its records reflected inventories of Thompson and other nationally-branded products in sufficient quantities to avoid the allegations of illegality made by Thompson, thus itself placing in further dispute the facts pertaining to inventory of products in GNC stores and the demand for such products.

7. From a time no later than August 25, 1978, and continuing at least until December 30, 1980, GNC created and maintained the following types of purchase, sale and inventory records, among others, which records are no longer available:

(a) Store Order Books, containing such information as a listing of each product which may be ordered by a given store, the maximum inventory level which that particular store was permitted to order of particular products (maximum inventory levels varied from product to product and from store to store), the prices at which individual products were to be sold in individual stores, and the location (by reference to shelf) of individual products in individual stores. Two copies of each Store Order Book were maintained by GNC, one in the Merchandising Department at GNC's headquarters in Pittsburgh and the other in the individual GNC stores, which were used by stores on a biweekly basis (each order book covering a 6 to 8 week order cycle) for taking inventory counts of what was in the store and for ordering additional products;

(b) Store Order Strips (for the time period between no later than August 25, 1978 and ending no earlier than the last week of September, 1979) which are strips of paper taken from each store's Order Book every other week and shipped to Pittsburgh for computer and other processing, and which contained such information as biweekly inventory counts and the amount of each item being ordered by the store;

(c) Store Invoices (otherwise sometimes called Stores-In-Detail Reports by GNC). These invoices, created each time an order was shipped from GNC's warehouse to a store in response to the store's previous biweekly order, contained the following information, *inter alia:* the date of the shipment, the number of units of each product ordered or demanded by the store, the number of units of each product shipped on that particular date to the store, the number of units in the store's inventory of particular products (as reported by the store on its biweekly order forms), and the price at which the shipped units of products were to be sold in individual stores;

(d) Fiscal year-end inventory count sheets, showing product-by-product unit counts (1) for 40% of the GNC stores taken in connection with the fiscal year-end inventory completed on or about January 29, 1979, and (2) for 100% of the GNC stores in connection with the fiscal year-end inventory completed by GNC on or about February 26, 1980;

(e) Quarterly inventory count sheets, showing product-by-product unit counts for each GNC store for inventories completed on or about November 4, 1979, May 2, 1980, August 3, 1980, and October 29, 1980;

(f) Daily Inventory Status Reports containing, *inter alia*, product-by-product inventory data for the GNC warehouses;

(g) Daily and Weekly Ship/Non-Ship Reports containing product-by-product data concerning the failure or success of GNC warehouses in meeting the demand on the warehouses created by GNC store orders;

(h) Lost Sales Reports, which were produced at least weekly and which set forth the amounts of "non-shipments"

(the difference between the amount ordered and amount shipped of a particular product) on a product-by-product basis from GNC's central warehouse facility at Preble Avenue, Pittsburgh, Pennsylvania; and

(i) Retail Level Summary Reports, which were produced by GNC every 4 to 8 weeks, and which showed average maximum inventory levels for each product in the GNC order book, as well as product-by-product price, cost and gross profit percentage data.

8. GNC also maintained at its headquarters in Pittsburgh, between at least June 15, 1978 and December 31, 1980, computer files (electronically readable tapes, discs and/or cards) on which the following types of data appearing on the records set forth in paragraph 7 above were retained for a period of between 2 and 12 weeks, depending on the particular type of data: fiscal year-end inventory data, quarterly inventory data, biweekly inventory data, biweekly store order demand data, and biweekly maximum allowable inventory level data on a product-by-product basis.

9. On August 25, 1978, GNC had in its possession at least the following records:

(a) Store Order Books for each GNC store (with biweekly inventory data, biweekly maximum inventory level data, and biweekly store order demand data) containing information for the period from 10 to 16 weeks prior to August 25, 1978;

(b) Store Order Strips for each GNC store containing biweekly inventory data and store order demand data for approximately 2 to 3 months prior to August 25, 1978;

(c) Store Invoices for at least 2 to 4 weeks prior to August 25, 1978; and

(d) Electronically-recorded computer historical records of biweekly store inventories, biweekly maximum store inventory levels, and biweekly store order demand data for approximately 4 months prior to August 25, 1978.

*GNC's Violation of Its Duties To Preserve*

10. All of the records set forth in Findings 7 and 9 above have been destroyed by GNC (here and hereafter "destroyed" includes the physical destruction, discarding, failure to retain in its possession, and—in the case of electronically-readable records—the erasure of records). None of these records is now available or recreatable.

11. GNC was on notice from the inception of the litigation that the records identified in Findings 7 and 9 above were relevant to the litigation or at least were reasonably calculated to lead to the discovery of admissible evidence. Notice was provided by the pre-litigation correspondence between counsel for the parties; the Complaint filed by Thompson on August 17, 1978; Thompson's requests for discovery served in August and September 1978 and the depositions conducted in September 1978; and Thompson's Motion for Preliminary Injunction filed on September 15, 1978. GNC's senior management knew, or should have known at the inception of this litigation that the records identified in Findings 7 and 9 above were relevant to the matters in issue, reasonably calculated to lead to the discovery of admissible evidence, and reasonably likely to be requested by Thompson during discovery in the litigation.

12. GNC destroyed the records identified in Finding 9 above and continued to destroy the documents identified in Findings 7 above after August 25, 1978. GNC also destroyed, at some time after the filing of the complaint and its receipt of Thompson's initial discovery requests, the electronically-maintained computer files containing the data described in Finding 8 above (except for maximum inventory level information which was retained beginning in February 1980).

13. GNC could have preserved and retained on computer tape or disc all of the purchase, sale and inventory information and data which was on the now-destroyed records described in Findings 7 and 9 above

without undue burden. GNC admits that it already possesses a computer tape and disc library of over 2000 tapes. The information contained on those remaining library tapes, however, cannot replicate the documents destroyed by GNC.

14. GNC did not instruct its employees to preserve the records set forth in Finding 7 and 9 above, or make any other efforts reasonably calculated to ensure that those records would be preserved, following the inception of this litigation. As a result of GNC's omission to take steps necessary to ensure the preservation of such records, they were destroyed by GNC employees.

15. On October 2, 1978, the Honorable Albert Lee Stephens, Jr., District Judge, United States District Court for the Central District of California, entered an order staying all proceedings in this litigation. At that time Thompson's initial discovery requests were still pending and had not been complied with by GNC or resolved by any order of the Court. GNC destroyed the records described in Findings 7, 8 and 9 above without regard to the stay order and without regard to Thompson's pending discovery requests. Neither GNC nor its counsel informed Thompson or the Court of this destruction, nor did GNC or its counsel seek leave of the Court or obtain permission to destroy any of these records.

16. On March 9, 1979, Thompson moved to vacate the stay of discovery; GNC opposed Thompson's motion on March 16, 1979. On April 13, 1979, the Court entered an order setting a date for filing of answers and appointing the Honorable Parks Stillwell as Special Master (the "Special Master"). In the Stipulation and Order of Reference dated July 2, 1979, the District Court ordered, and the parties agreed to, the granting of pretrial powers and duties for the purpose of having the Special Master supervise and govern all discovery and pretrial proceedings. The Order of Reference authorized the Special Master, in addition, to issue protective orders, determine whether discovery orders had been complied with, and submit to the District Court a final pretrial order. Under paragraph A.4 of the Order of Reference, all unreviewed orders of the Special Master became the orders of the District Court. Neither GNC nor its counsel took steps to prevent or defer the destruction of the documents or information identified in Findings 7, 8 or 9 above, pending the assumption by the Special Master of his formal duties.

17. Prior to the entry of the Special Master's July 1979 preservation order, counsel for Thompson attempted to negotiate an agreement with counsel for GNC whereby GNC would voluntarily preserve certain documents, including documents described in Findings 7 and 9 above and which GNC destroyed before, during, and after the period in which negotiations were conducted. GNC did not agree to voluntarily preserve documents as requested by Thompson.

*GNC's Violations of the July 1979 Order*

18. On July 17, 1979, at the first proceedings of the parties before the Special Master, the Special Master ordered GNC to preserve all purchase, sale and inventory records maintained by GNC in the ordinary course of business at its headquarters in Pittsburgh, Pennsylvania. Such order was based, in part, upon representations made by GNC's counsel that GNC routinely maintained copies of all purchase, sale and inventory records, or their originals, as well as other documents, at its headquarters in Pittsburgh, Pennsylvania. This July 1979 Preservation Order (the "July 1979 Order") was embodied in a written order which was executed by the Special Master and, thereafter, the District Court in September 1979.

19. GNC's employees were not instructed by GNC or its counsel to preserve purchase, sale and inventory records as required by the July 1979 Order. GNC's president, Mr. Gary Daum, issued a memorandum dated July 27, 1979, to all GNC personnel advising them that the Order "should not require us to change our standard document retention or destruction policies or practices." This instruction on its

face appears to instruct GNC employees to conduct their destruction procedures as they had done in the past and it was so interpreted by GNC employees. This memorandum did not result in the retention of records as required by the July 1979 Order and operated to authorize or condone GNC practices which resulted in the destruction of critical evidence.

20. GNC's general counsel, Mr. George Bacso, and GNC's counsel of record herein, attended the July 17, 1979, hearing before the Special Master. Neither Mr. Bacso, who drafted Mr. Daum's memorandum, nor counsel of record herein, instructed GNC employees to preserve purchase, sale and inventory records as ordered.

21. Neither GNC nor its counsel made any credible attempt to insure or monitor GNC's compliance with the July 1979 Order. Mr. Daum's memorandum was itself an insufficient means to insure or monitor compliance with the Order.

22. GNC contends that it has never had a formal or written document retention or preservation policy. Furthermore, GNC contends that the practices of retention and destruction of all records described in Findings 7, 8 and 9 above, were left up to individual GNC departments, and sometimes individual employees, for their decision. The individual GNC departments and employees maintaining those documents were not, however, contacted by GNC or its counsel in order to insure that any of GNC's duties to preserve documents or to comply with the July 1979 Order were being met.

23. The July 1979 Order, and any reasonable construction thereof, required GNC beginning on July 17, 1979, and continuing to the present, to preserve all purchase, sale and inventory records which were in its possession on the date of the Order, as well as such records created on or after July 17, 1979. No reasonable construction of the July 1979 Order, or its written memorialization of September 5, 1979, could limit GNC's continuing obligation to preserve such documents.

24. The record indicates that the only documents which GNC preserved at any time as a result of the July 1979 Order were bulk cash register tapes and, belatedly, Store Order Strips (beginning in late September 1979 at the earliest). No one could have attended the hearing before the Special Master on July 17, 1979, and have reasonably concluded that the Order was intended to have such negligible effects.

25. At a minimum, all of the records identified in Finding 7 above which were created on or after July 17, 1979, as well as all of the following purchase, sale and inventory records predating July 17, 1979 (which, among others, were in GNC's possession on July 17, 1979), were required by the July 1979 Order to be preserved by GNC:

(a) Store Order Books for each GNC store (containing historical store order demand, biweekly inventory, maximum store inventory level, and related data) for 10 to 16 weeks prior to July 17, 1979;

(b) Biweekly Order Strips for each GNC store dating back approximately 2 to 3 months prior to July 17, 1979;

(c) Store Invoices for at least 2 to 4 weeks prior to July 17, 1979; and

(d) Full store order information (including such data as biweekly inventory counts, store order demand, and maximum inventory levels) which was retained on computer tape for the period covering approximately 4 months prior to July 17, 1979.

26. After July 17, 1979, GNC destroyed at a minimum both (a) the records in its possession as identified in Finding 25 above, as well as (b) those records identified in Finding 7 above which were created by GNC on or after July 17, 1979. This destruction was in violation of the July 1979 Order, as well as GNC's other legal duties.

27. GNC also destroyed the computer files from which the data identified in Finding 8 above might have been alternatively obtained for the time period covered by the destroyed documents (with the exception of maximum store inventory level limitations

which began to be preserved by GNC for the first time, and then solely in electronically readable form, in approximately February of 1980).

28. Records containing warehouse shipment data (information concerning amounts shipped from GNC warehouses to retail stores) were covered by the July 1979 Order, and the Order was so understood by GNC. The July 1979 Order was interpreted by GNC to cover documents which contain warehouse shipment data, including such documents as Inventory Status Reports and Store Invoices. GNC, however, destroyed such documents after the entry of the July 1979 Order.

29. At no time did GNC or its counsel inform the Special Master or Thompson of its ongoing destruction of documents, seek leave of the Special Master or the Court to destroy such documents, or intercede to prevent the destruction of any of the records set forth in Findings 7, 8, 9, and 25 above.

30. GNC alleges that it may have retained certain warehouse shipment data for certain four-week periods. Such data, if it still exists, is not duplicative of the inventory, demand and maximum inventory level data which GNC destroyed. The inventory, demand, and maximum inventory level data which was lost in connection with GNC's destruction of the records identified in Findings 7, 8, and 9 above, is not recreatable from the information which GNC now alleges it may have retained.

31. The documents and other evidence destroyed by GNC are not capable of reconstruction or replication.

### GNC's Violations of the January 1980 Order

32. On August 10, 1979, Thompson submitted to GNC its "First Request for the Production of Documents and Things Propounded by Plaintiff to Defendant General Nutrition Center, Inc." and its "First Request for the Production of Documents and Things Propounded by Plaintiff to Defendant General Nutrition Corporation" (hereinafter collectively referred to as "the First Requests"). These discovery requests were the first in a schedule of discovery expressly adopted by the Special Master and ordered to be implemented on July 17, 1979, at the first hearing before him.

33. On August 10, 1979, the date of Thompson's submission of the First Requests, GNC had in its possession at least the following records which GNC destroyed after August 10, 1979:

(a) Store Order Books for each GNC store (with biweekly inventory data, maximum inventory level data, and biweekly store order demand data) containing information for the period from 10 to 16 weeks prior to August 10, 1979;

(b) Store Order Strips for each GNC store containing biweekly inventory data and store order demand data for a period of approximately 2 to 3 months prior to August 10, 1979;

(c) Store Invoices for a period of at least 2 to 4 weeks prior to August 10, 1979; and

(d) Electronically-recorded records of biweekly store inventories, maximum store inventory levels, and biweekly store order demand data for a period of approximately 4 months prior to August 10, 1979.

34. GNC objected to Thompson's First Requests and Thompson moved for an order compelling production.

35. At a hearing before him on January 21, 1980, the Special Master entered an order (the "January 1980 Order") compelling GNC to produce documents in response to certain of the requests contained in Thompson's First Requests. At that hearing, counsel for GNC represented to the Special Master that GNC's headquarters in Pittsburgh and its six regional offices received and maintained the documents responsive to Thompson's discovery requests. Accordingly, the Special Master confined GNC's search to its headquarters and six regional offices. The January 1980 Order further required GNC to preserve all documents at its headquarters and six regional offices responsive to Thompson's

First Requests until all such documents were either produced to Thompson, or the matter further resolved by the Special Master. The Special Master further ordered GNC not to alter its document retention practices at its other business locations until further notice. On March 7, 1980, the January 1980 Order was embodied in a written stipulation and order.

36. After being served with Thompson's First Requests, GNC destroyed, at a minimum, the documents and data set forth in Finding 33 above. Each of these documents which contained information for the period between July 1, 1977 to August 1, 1979, was responsive to Thompson's First Requests.

37. The January 1980 Order did not, nor could it have been reasonably construed or interpreted to have, modify or supersede the July 1979 Order or GNC's continuing duty to comply with the July 1979 Order. GNC did not interpret the January 1980 Order to modify or supersede the July 1979 Order at the time the January 1980 Order was entered. For example, GNC requested leave of the Special Master as late as July 1980 to be relieved of its obligations under the July 1979 Order as it applied to the preservation of certain store cash register tapes.

38. Each of the documents identified in Finding 33 above which contained information from the period from July 1, 1977 to August 1, 1979, was ordered by the Special Master to be produced by GNC in the January 1980 Order. These documents were not produced to Thompson in response to the January 1980 Order, to Thompson's First Requests, or otherwise.

39. The documents identified in Finding 33 above were destroyed after August 10, 1979. The destruction of each of these documents which contained information from the period from July 1, 1977 to August 1, 1979, were violations of the January 1980 Order. The destruction was also in violation of GNC's continuing duties to preserve records. The destruction of all of the records identified in Findings 7, 8, 9, 25 and 33 above in existence on or created after

July 17, 1979, also violated the July 1979 Order.

### Prejudice to Thompson

40. GNC's violations of orders and of its duties here has caused prejudice to Thompson.

The records destroyed by GNC were relevant, at a minimum, to Thompson's allegations and contentions that: (a) GNC's advertisements were false and deceptive due to the inadequate inventories of Thompson and other products in GNC's stores, by showing, *inter alia*, the actual inventories which GNC's own records showed it had on hand; (b) such false advertisements formed part of marketing devices used to sell GNC's own products as opposed to those products advertised by GNC, by showing, *inter alia*, the numbers and types of GNC's own products which GNC's own records showed it had on hand; (c) said marketing devices were deliberately and intentionally implemented by GNC and that GNC purposefully set maximum inventory levels for Thompson and other products at low levels in order to sell GNC's own products to customers, by showing, *inter alia*, the levels actually set by GNC and any written instructions regarding those levels; (d) GNC imposed these levels at artificially low amounts regardless of demand, by showing, *inter alia*, the actual level and demand information; (e) GNC targeted local and regional competitors and utilized unlawful predatory pricing and advertising practices to cause harm to local and regional competition as part of its attempted monopolization, by showing, *inter alia*, local or regional differences in inventory, levels, sales, pricing and demand; and (f) these marketing and advertising practices were a part of a deliberate pattern of predatory conduct engaged in by GNC in an attempt to monopolize, by showing, *inter alia*, a persistent false advertising scheme and a persistent targeting of competitors.

41. The records destroyed by GNC were relevant, at a minimum, to Thompson's allegations and contentions that GNC's practices caused damage to Thompson by, *inter*

*alia,* diverting trade from Thompson products to GNC's own products. GNC's records would have reflected any shifts or diversion in sales over time, among other data trends, and would have tended to show any damages Thompson suffered from GNC's activities.

42. The records destroyed by GNC also were relevant, at a minimum, to Thompson's defenses and counterclaims in *General Nutrition Corporation, etc. v. Wm. T. Thompson Co.,* No. CV 78–3891.

43. The records destroyed by GNC also were relevant, at a minimum, to Thompson's defenses to GNC's allegations of damages. GNC has alleged that its damages for a period from prior to the filing of its complaint to the present would consist largely of lost sales of Thompson products, of other national brands, and of GNC's own products due to the unavailability of Thompson products in GNC's stores.

44. The records destroyed by GNC have impaired Thompson's ability to effectively obtain consulting and expert advice on the liability and damage issues referred to above and to utilize such advice for discovery and trial purposes.

45. The records found herein to have been destroyed by GNC are not available from any other source and are not recreatable.

46. Delay in these proceedings caused by GNC's order violations and violations of its duties has caused additional prejudice to Thompson. Witnesses may be difficult to locate, memories may have faded or been distorted, and other documentary evidence may now be destroyed.

47. GNC's destruction of relevant records appears to have deprived Thompson of the best objective evidence on many central issues for presentation to an independent trier of fact and has impaired Thompson's ability to obtain a full and fair trial by jury on all issues raised by Thompson. This is particularly so where issues of intent and conduct have been raised on both sides and where conflicting oral testimony may be offered by both parties.

### The Supplier Documents

48. On August 10, 1979, Thompson served GNC with its First Request for the Production of Documents and Things ("First Request"). The First Request sought from GNC, among other things, documents pertaining to the alleged "suppliers" of Thompson products to GNC (other than Thompson itself). When GNC did not produce the documents requested in Thompson's First Request, Thompson filed a motion seeking a Rule 37(a) order compelling production. On January 21, 1980, the Special Master heard oral argument on Thompson's Rule 37(a) motion, granted it, and ordered GNC to produce the requested records on a date certain. This January 21, 1980 Order was reduced to writing on March 7, 1980.

49. GNC did not produce a single identifiable supplier document in response to the Special Master's January 21, 1980 Order as required. GNC was, accordingly, in violation of said Order.

50. On February 9, 1981 (and again on April 8, 1981) Thompson served Notices of Deposition on a number of GNC executives and employees. Each Notice contained a request for the production of documents under Rule 30(b), including documents with respect to GNC's alleged suppliers of Thompson products.

51. On February 18, 1981, a telephonic hearing was held concerning Thompson's request to compel production of the documents. The Special Master again ordered GNC to produce all requested documents with respect to the alleged suppliers of Thompson products, with the proviso that, subject to a future motion by Thompson, GNC could delete portions revealing the identity of a supplier directly or by implication.

Other than a single document produced at the deposition of Mr. Joseph Bresse, not a single supplier document was produced by GNC to Thompson at any deposition as a result of the Special Master's February 18, 1981 order.

52. On May 15, 1981, Thompson filed a motion for the imposition of Rule 37(b) sanctions upon GNC and for a further order directing GNC to produce all supplier-related documents as previously ordered and without further delay. After hearings on May 30, 1981 and July 9, 1981, the Special Master found that GNC had, in fact, violated the previous Orders referred to above and announced his intention to sanction GNC for its refusal to comply with the aforesaid January 21, 1980 and February 18, 1981 Orders on the subject.

53. By a written Order dated August 12, 1981, the Special Master imposed upon GNC sanctions in the amount of $14,068.

The August 12, 1981 Order also directed GNC to again produce all supplier documents specified in the Order itself (this time without deletion of any information) and required that this be accomplished "within twenty (20) days" (i.e. by September 2, 1981). The Order specifically set forth the precise document and discovery requests of Thompson with which GNC was to comply.

54. Despite the express requirement that GNC produce all supplier documents "within twenty (20) days," GNC did not produce all documents as ordered by September 2, 1981. GNC did produce some supplier documents on that date but said that others could only be identified and produced if GNC made a "special computer run" and GNC demanded that Thompson pay for such a program. As of September 2, 1981, GNC was in violation of the August 12, 1981 Order—the second written order on this one subject—by failing to produce all documents in its possession as ordered.

55. GNC was again ordered (on October 13, 1981) to produce all requested documents as ordered August 12, 1981 on or before October 21, 1981. This Order also imposed sanctions on GNC for its refusal to comply fully with the August, 1981 Order and GNC paid $1,376.00 to Thompson for the fees and other expenses incurred by Thompson.

56. GNC did not produce all documents on October 21, 1981 as ordered. Initially, counsel for GNC represented to Thompson's counsel that a full and proper search had occurred. However, and only after persistent inquiry by Thompson's counsel, GNC produced over 150 pages of additional documents on December 8 and December 11, 1981—over 6 weeks later than required by the explicit terms of the October 13, 1981 Order. Furthermore, GNC did not even conduct a formal inquiry of its regional offices and stores until March, 1982 and that inquiry itself did not constitute an adequate search for documents ordered to be produced. Thereafter, GNC produced additional documents on May 18, 1982—almost 7 months after the date set for full and final compliance and only after Thompson had filed a motion seeking sanctions for GNC's failure to comply and seeking a further order compelling complete production.

57. GNC's failure to produce, in a timely fashion, the subject documents violated the October 13, 1981 Order and its mandate that all documents be produced on or before October 21, 1981.

58. By failing to again adequately search for and produce all documents as expressly ordered, GNC's conduct was tantamount to contempt of the Special Master's order.

59. Even after the belated productions in December, 1981, and May, 1982, GNC still has not searched for and produced all documents as ordered. Despite the express terms of the August 12, 1981 and October 13, 1981 Orders specifically identifying the deposition notices of Messrs. Dobies, Eby, Withrow, Bresse, Bentley, Sulik, Rawlik, Rusnak and Lied, some of these employees were never instructed to search files under their control for documents responsive to their deposition Notices. GNC has yet to produce documents that others of these employees had testified existed. Moreover, GNC's middle-level managers and store managers were not contacted and expressly instructed to conduct a thorough search for all the requested documents (de-

spite the fact that Thompson's requests to produce as well as the court's Orders called for a company-wide search for responsive documents). Although the evidence establishes that Thompson products were purchased by non-headquarter's personnel, Thompson has received no documents from the store or regional levels of GNC's operations that were identifiable as such. Nor did GNC circulate anything in writing or give any oral instructions on a corporate-wide basis requesting or instructing its employees to conduct an actual and thorough search for, or to identify, any documents relating to those persons identified by GNC as "potential", rather than "actual", sources of Thompson products. Thus far, GNC has yet to produce any documents covering "potential suppliers" of Thompson products despite the fact that Thompson's requests and the Special Master's Orders cover such documents. GNC thus remains in violation of the October 13, 1981 Order and its predecessor Orders to this day and a further corporate-wide search will be required to insure that all documents ordered to be produced will, in fact, be produced to the extent they have not been lost or destroyed.

60. There is a strong and compelling inference that GNC destroyed or failed to retain supplier-related documents despite the requirements of the Special Master's July, 1979 and January, 1980 document preservation Orders and that GNC has violated said preservation Orders. By destroying said documents, GNC disabled itself from complying fully with the Special Master's subsequent document production Orders referred to above.

### Violation of Local Rules

61. At the June 2, 1982 hearing on a motion brought by Thompson, GNC served upon Thompson additional opposition papers exceeding 700 pages in length and totalling 3⅛" in thickness.

The belated submissions of GNC and its counsel were untimely and were improper under Local Rule 3.6.1. (References to the Local Rules in this section are to those in effect in 1982.) No leave of court was sought to submit them in this fashion and no good cause was shown why they could not have been submitted timely in compliance with the Local Rules and in compliance with the briefing schedule agreed to by the parties and the court. These belatedly filed papers addressed issues initially raised in Thompson's original moving papers, which were filed on April 20, 1982, and GNC could have addressed these issues in its opposition papers. The filing of such voluminous documents on the very day of the oral argument was calculated to cause delay and to prejudice Thompson and prevent it from responding properly thereto. GNC's and its counsel's motion to strike was, in addition, frivolous within the meaning of Local Rule 3.19, in that it moved to strike GNC's own letters, transcripts of public court proceedings, and other documents which the court had already accepted during prior proceedings, including some of the same exhibits GNC itself introduced and relied upon in its own opposition to the motion. For these untimely, frivolous, and improper filings, GNC and its counsel are sanctioned pursuant to Local Rules 3.3.3, 3.19 and 28 and these papers are stricken and disregarded for all purposes.

62. In addition to the untimely service and filing of the documents referred to above, GNC delivered to Thompson's counsel, at approximately 9:00 P.M. of the evening before the June 2, 1982 hearing, over 1,000 pages of documents allegedly substantiating the statements made in the sworn affidavits of Michael D. Fox, George J. Basco and Donna A. Kurzawski submitted with GNC's opposition papers. These documents were required to have been made available to Thompson under Local Rule 3.5.3 and Rule 1006 of the Federal Rules of Evidence at a reasonable time prior to the hearing. They were not. These documents were served only after Thompson's counsel had specifically insisted upon their production and then were delivered belatedly. This late production was unreasonable and calculated to cause

prejudice to Thompson and to create further delay in these proceedings.

### Bad Faith

63. GNC's destruction of documents, violations of court orders, and violations of its duties reflect bad faith. This bad faith is demonstrated, at a minimum, in GNC's failure to preserve critical documents after commencement of these actions; its failure to implement procedures to monitor or control document destruction after the commencement of these actions; its erroneous or negligent representations to the court and counsel; its failure to preserve any records other than relatively useless bulk cash register tapes and store order strips in response to a clear preservation order of the court; its erasure of computer tapes and discs which could have been utilized to store some of the destroyed information relatively simply; its failure to implement any procedures to monitor or control document destruction after entry of the Special Master's orders; its providing employees with instructions that amounted to approval for document destruction; its belated attempt to exonerate itself from its order violations by proffering a series of contradictory and factually unsupportable excuses; its attempts to obstruct or delay the court's inquiry into the scope and import of GNC's destruction as alleged by Thompson; and its indifference to the authority of the court and its violations of other discovery orders of the court.

64. GNC's destruction of relevant records has caused Thompson to divert substantial sums of money in attempting to discover and obtain the records GNC wrongfully destroyed and in bringing on motions and requests to the court for relief from GNC's wrongful conduct.

65. GNC's and its counsel's conduct of discovery in this litigation was intended to and has unfairly expanded the proceedings so as to unreasonably burden and vex Thompson and divert· Thompson's resources unnecessarily.

66. GNC has sought to and has succeeded in frustrating and obstructing discovery and the advancement of these litigations. GNC's conduct during discovery in the litigation has been either in derogation of or in disregard for the authority of the court.

67. GNC has engaged in a pattern of order violations and discovery abuse, including defiance and indifference to the orders of the court, to their obligations and duties as litigants, and to the discovery process under the Federal Rules of Civil Procedure.

68. Any Conclusion of Law deemed a Finding of Fact is incorporated herein.

### CONCLUSIONS OF LAW

1. Any Finding of Fact deemed a Conclusion of Law is incorporated herein.

2. Pursuant to the order made at the hearing of July 12, 1984, the only issue currently before the Court is whether sanctions should be imposed against GNC. The issue of whether GNC's counsel should be held jointly liable for a portion of the monetary sanctions is not addressed in these Findings of Fact and Conclusions of Law, but is instead reserved pending further proceedings.

### Standard of Review

3. The Special Master's Findings of Fact and Conclusions of Law are subject to *de novo* review by this Court, pursuant to paragraph 4 of the Order of Reference filed July 3, 1979. Although a master's findings of fact are normally subject to review under the "clearly erroneous" standard established by Rule 53(e)(2) of the Federal Rules of Civil Procedure, *see, e.g., United States v. Washington,* 730 F.2d 1314 (9th Cir.1984); *Fisher v. Harris, Upham & Co.,* 61 F.R.D. 447 (S.D.N.Y.1973), the parties to this action agreed to impose the more stringent *de novo* review standard. Rule 53(c) provides that "[t]he order of reference to the master may specify or limit his powers," and the provision for *de novo* review is a limitation on the Master's power to make binding findings of fact. The *de novo* review provision of the Order of Reference therefore supersedes the oth-

erwise applicable standard prescribed by Rule 53(e)(2).

4. The *de novo* review prescribed by paragraph 4 of the Order of Reference entails a review of the written record before the Special Master at the time of his decision, and does not give either party the right to demand an evidentiary hearing in the district court. The Order of Reference provides only that the party seeking review shall submit (1) a transcript of the proceedings before the Special Master and (2) a concise statement of the issues, the contentions of the parties, and points and authorities thereon. Neither the Order of Reference nor any provision of Rule 53 requires the district court to rehear argument or evidence, or to permit the aggrieved party to submit additional evidence that was not presented to the Special Master. This interpretation of the Order of Reference is consistent with *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), wherein the Supreme Court held that a district court's "de novo determination" of a magistrate's decision could be made without an evidentiary hearing. *See also Pacemaker Diagnostic Clinic v. Instromedix,* 725 F.2d 537, 546 (9th Cir.1984).

5. Although neither party has the right to demand an evidentiary hearing on review, neither the Order of Reference nor Rule 53 prohibits the district court from conducting such a proceeding as a matter of discretion. An evidentiary hearing in this Court might be necessary if the Special Master had based his decision upon the credibility of live witnesses who testified before him. *Raddatz, supra,* 447 U.S. at 681 n. 7, 100 S.Ct. at 2415 n. 7. In this case, however, neither party presented live witness testimony to the Special Master, but instead submitted deposition testimony, affidavits, and documentary evidence. All of that evidence is now before the Court, permitting a full review of the record before the Special Master. An evidentiary hearing would not materially assist the Court in reviewing this record, thus it will not be conducted.

*Propriety of Sanctions*

6. This Court possesses an inherent power to sanction litigants for abusive litigation practices that are taken in bad faith. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Link v. Wabash Railroad Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *Chism v. National Heritage Life Insurance Co.,* 637 F.2d 1328 (9th Cir. 1981). Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information. While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request. *Bowmar Instrument Corp. v. Texas Instruments, Inc.,* 25 Fed. R.Serv.2d 423 (N.D.Ind.1977); *In re Agent Orange Product Liability Litigation,* 506 F.Supp. 750 (E.D.N.Y.1980).

7. GNC is subject to sanctions, imposed under the inherent powers of the Court and Rule 37 of the Federal Rules of Civil Procedure, for knowingly and purposefully permitting its employees to destroy key documents and records. This destruction resulted in prejudice to Thompson, since it deprived Thompson of access to the objective evidence needed to build a case against GNC. GNC's conduct creates a presumption that the missing data would have permitted Thompson to prove the bait-and-switch advertising claims that lie at the heart of its complaint.

8. GNC is also subject to sanctions, under Rule 37 of the Federal Rules of Civil Procedure, for failure to comply with the Special Master's orders to produce the supplier documents. GNC failed to comply with four successive orders to produce the

documents, issued over a 21-month period between January 1980 and October 1981. GNC's partial last-minute tender of responsive documents does not cure the damage created by this delay, and consequently does not immunize GNC from the imposition of sanctions. *See Wyle v. R.J. Reynolds Industries, Inc.,* 709 F.2d 585, 591 (9th Cir.1983); *G–K Properties v. Redevelopment Agency,* 577 F.2d 645, 647–48 (9th Cir.1978).

### The Choice of Sanctions

9. The "ultimate" sanction of striking GNC's answer and entering default in case No. CV 78–3206 CHH, and dismissing its complaint in case No. CV 78–3891 CHH, is appropriate in this action. GNC's destruction of critical documents deprived Thompson of access to the objective evidence it needed to build its case against GNC. Default and dismissal are proper sanctions in view of GNC's willful destruction of documents and records that deprived Thompson of the opportunity to present critical evidence on its key claims to the jury. *See, e.g., National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Professional Seminar Consultants, Inc. v. Sino American Technology Exchange Council, Inc.,* 727 F.2d 1470 (9th Cir.1984).

10. Default and dismissal are also appropriate sanctions for the repeated violations of the Special Master's orders to produce the supplier documents. *See, e.g., G–K Properties, supra.* This pattern of discovery order violations constitutes an independent basis for imposing the sanctions of default and dismissal.

11. The Court has considered the propriety of the less severe sanction of entering an order precluding GNC from introducing certain matters into evidence: *to wit,* any evidence contesting Thompson's claim that GNC stores stocked only a *de minimus* quantity of Thompson products during the relevant time period. Such a sanction is inappropriate for three reasons. First, entry of an evidence preclusion order would virtually compel a directed verdict for Thompson on several of its claims, e.g.,

the business tort claims asserted in Count III and the Lanham Act claim asserted in Count IV. The proposed order would unequivocally establish the truth of Thompson's bait-and-switch advertising claims, which would, as a matter of law, entitle it to relief on several of its claims. Second, the Court may, in its discretion, require proof of additional facts in a default judgment hearing that are essential to the proof of Thompson's claims. *See, e.g., Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir.1981); *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 229 (1st Cir. 1980). For example, since Thompson's Sherman Act claim asserts that GNC conspired with various unknown co-conspirators, it may be appropriate to require Thompson to produce evidence of the existence and identity of the co-conspirators before treble damages are awarded. Third, the discovery abuses that occurred in this litigation are far more serious in magnitude than in cases such as *G–K Properties, supra,* and *Professional Seminar Consultants, supra.* Imposition of severe sanctions is required in this case by the severity of the abuses that took place. The record shows that GNC deliberately and purposefully undertook a program to impede and obstruct the litigation process, presumably because it believed that the case would be lost if all of the evidence ever came to light. Imposition of a lesser sanction would only reward GNC for its misconduct in this litigation.

12. The Special Master awarded Thompson a total of $453,312.56 in his two reports, reflecting the cost to Thompson of attempting to compel the production of nonexistent documents, attempting to compel the production of the supplier documents in response to the Special Master's orders, engaging in the special discovery ordered to determine the extent of GNC's document destruction, and pursuing the motions for sanctions that culminated in the Special Master's reports. Imposition of monetary sanctions in addition to default and dismissal are necessary to fully compensate Thompson for the costs entailed by GNC's misconduct. Thompson must, however, provide additional documentation of

its attorneys' fees incurred in these matters. Specifically, Thompson should file a statement showing the number of hours worked by each attorney on these matters and the billing rate for each attorney. Hours may be aggregated on a monthly basis. Thompson should also provide a brief statement specifying the matters worked on by each attorney each month.

13. The Special Master's orders imposing monetary sanctions were issued on April 26, 1982 and July 26, 1982, and GNC sought review by the district court within 10 days as required by the Order of Reference to the Special Master. District court review has, however, taken over two years to accomplish.* Thompson is entitled to interest on the monetary sanctions from the date that district court review was sought in order to fully compensate it for the delay occasioned by the review process. Since no specific rate of interest is fixed by either statute or rule under these circumstances, the Court will award interest at the rate specified by 26 U.S.C. § 6621 through the date of entry of the order affirming the Special Master's action.

---

* Following briefing of the issues by the parties, hearings were conducted before Judge Stephens on November 1, 1982 and August 29, 1983. By order dated March 19, 1984, Judge Stephens transferred the litigation to me.