OPINION OF THE COURT
William P. Polito, J.
The plaintiffs’ motion for summary judgment is partially granted. The plaintiffs are entitled to a “res ipsa” position at trial regarding pole No. 103 and the two poles carrying the “live” wires which struck the plaintiffs Napolitano’s vehicle. Defendants are also precluded from introducing evidence to rebut the presumption of negligence, but are not precluded from testing and/or introducing results and/or opinions from tests of the samples of pole No. 103 found after the accident to rebut the presumption of negligence. (Assuming the pieces can be properly identified.)
Defendants are not precluded from proving a superseding, intervening and unforeseeable cause. The determination is based on the following.
FACTS
This cause of action arose during an unusually wintery 50-mile-per-hour wind and ice storm on January 27, 1994. During the storm, 14 electric poles situated on Lyell Road (Route 31) in the County of Monroe and Town of Ogden between Gillette Road and Manitou Road fell, while several remained standing. On that eve at 9:08 p.m. plaintiff Beverly Conderman was traveling westerly to her home from work when one of the 14 poles (No. 103) crashed through her windshield striking her in the face and head causing near fatal injuries. She suffered severe permanent injuries including permanent brain injuries. Plaintiffs Mr. and Mrs. Napolitano were also traveling on Route 31 but in an easterly direction and were injured when “live” wires fell on their vehicle. The fallen poles to which the lines were attached were not identified.
The defendants Rochester Gas & Electric Corporation (R.G.&E.) and Ogden Telephone Company (OTC) owned and had control of the utility poles. The defendant Greater Rochester Cablevision leased use of the utility poles. The defendant *10 Osmose Wood Preserving, Inc. (Osmose) contracted with R.G.&E. to inspect, maintain and/or perform necessary testing and work on the wood poles.
The. plaintiffs contend the defendants were negligent in allowing the wood in the poles to become defective, which caused them to fall. Both groups of plaintiffs assert that the defendants destroyed the “crown jewel” of evidence, i.e., the poles, needed to support their cases. Plaintiffs Napolitano on February 14, 1994 filed an order to show cause signed by Judge Wisner ordering that defendants do nothing to destroy the utility poles. On April 20, 1994, Judge Wisner signed a second order to show cause directing that any agents of defendants refrain from destroying and/or damaging the poles in question.
By letter dated May 19, 1994, attorney for defendant R.G.&E. advised that under the direction of defendant R.G.&E. and OTC, the poles had been cut up into four-foot pieces and disposed of within 24 hours of the accident. On the evening of the accident due to the necessity of clearing the road and restoring power, the poles in the road were cut into four-foot pieces, and stacked along the side of the road. The remaining portions of any poles still standing were also cut to ground level and stacked. Thereafter, the wood was loaded by R.G.&E. crews onto its trucks and delivered to its nearby western Monroe County site where it was discarded in a dumpster. The said defendant then hired an independent contractor to haul the wood to Seneca Meadows Land Fill in Seneca County for destruction.
On the evening of the accident an R.G.&E. risk management team (Mr. Thomas Powell and Ms. Elizabeth Casey) were called and arrived at the scene within 1.5 hours of the accident. The written rules of R.G.&E. required that specific claims personnel be called when a nonemployee was injured. Mr. Powell, the head of the Claims Department, is one of three persons explicitly listed from the Claims Department to be called. Mr. Powell was also the manager of the risk management team which is under the auspices of the Claims Department. The report sheet for that evening shows a call-in of a “fatality” to which Mr. Powell and Ms. Casey were then notified and responded. The next item on the report is a call indicating “12 poles down, due to MVA isolated area & reenergized” (exhibit T). These experienced claims personnel proceeded to the scene where they took pictures of the injured plaintiff Conderman’s vehicle including the license plate, blood-stained interior, and the pole which was still on and inside the vehicle. However, *11 they made no effort to mark, identify, preserve, or test the poles involved in the injuries. Plaintiffs contend that such immediate investigation and selective preservation of evidence by experienced claims personnel called to specifically investigate the fatality showed a high degree of awareness by defendants of a possible lawsuit. Plaintiffs further assert that even if the poles were cut up, the immediate untested destruction was not necessary. They claim it would not have been a large inconvenience for the defendant to simply have kept at least those poles which caused the injuries at its delivery site location in western Monroe County until testing had been performed.
Although the poles were destroyed, plaintiffs did obtain some small fragments from the scene. These fragments were discovered by plaintiffs’ investigators shortly after the accident. The investigators marked these fragments according to the number of the pole closest to where the fragment was found, including several as No. 103. Plaintiffs assert that those fragments marked No. 103 by their investigators were not from pole No. 103. Plaintiffs have submitted an affidavit of George Kyanka, Ph D expert, who states that there remain only nine very small fragments which, except for pole No. 99A, were less than a few feet in length and less than a few inches thick. Kyanka further states that he visited the site in May of 1994 and none of the pole stumps remained. Kyanka states that he took a core sample of two poles, which did not fall, and a core sample from pole No. 99A, which did fall. He asserts however, that these samples are essentially irrelevant because they are not of the pole which fell on the plaintiff’s vehicle. More importantly, he asserts that because wood has inherently different variable characteristics in material the poles do not uniformly decay or otherwise degrade as between each other, or even at different places in the same pole. Therefore, he states he is unable to make any objective, definite conclusions as to the physical integrity of any of the poles on the date of the accident.
APPLICABLE LAW
At least two years prior to the subject January 1994 accident, the law in New York had established a high “Spoliator Beware” standard wherein even the negligent, nonwilful, destruction of crucial and dispositive evidence in the sole possession of one of the parties could bring severe sanctions of dismissal or summary judgment against the destroying party. Such destruction is “a major departure from professional and reasonable standards of care within the litigation industry”. (Hoenig, Spolia *12 tion Update; 'Reasonable’ Expert Fee, NYLJ, Apr. 13, 1992, at 3, col 1.) Personal injury specialists, defense as well as plaintiff, almost uniformly recognize the elevated priority of preserving the evidence, so that drastic sanctions are not necessarily unduly harsh sanctions when a critical item of evidence is not preserved. (Hoenig, Spoliation of the ‘Crown Jewels’: An Update, NYLJ, Mar. 11, 1991, at 3, col 1; Hoenig, Spoliation Update; ‘Reasonable’ Expert Fee, NYLJ, Apr. 13, 1992, at 3, col 1.) Some States even recognize a tort of intentional as well as negligent spoliation, underscoring the seriousness with which it is treated. (See, e.g., Continental Ins. Co. v Herman, 576 So 2d 313 [Fla 1991]; Kirkland v New York City Hous. Auth., 236 AD2d 170, 174 [1st Dept 1997].) The matter of spoliation involves “sound public policy”. (Hoenig, Spoliation Update; ‘Reasonable’ Expert Fee, NYLJ, Apr. 13, 1992, at 6, col 3.)
New York has adopted a strong public policy. “After all, the importance of the device allegedly causing the injury as a physical item of evidence is critical: ‘the physical items themselves, in the precise condition they were in immediately after an accident, may be far more instructive and persuasive to a jury than oral or photographic descriptions’ (Nally v Volkswagen of Am., 405 Mass 191, 198, 539 NE2d 1017, 1021 [1989]).” (Kirkland v New York City Hous. Auth., 236 AD2d 170, 175 [1st Dept 1997], supra.)
“When a party alters, loses or destroys key evidence before it can be examined by the other party’s expert, the court should dismiss the pleadings of the party responsible for the spoliation (Mudge, Rose, Guthrie, Alexander & Ferdon v Penguin Air Conditioning Corp., 221 AD2d 243 [dismissing plaintiffs claim due to its ‘negligent loss of a key piece of evidence which defendants never had an opportunity to examine’]), or, at the very least, preclude that party from offering evidence as to the destroyed product (Strelov v Hertz Corp., 171 AD2d 420, 421 [defendant precluded from presenting any evidence in defense of suit based on allegedly defective rental car, except as to the parts of the car that defendant had not destroyed]).” (Squitieri v City of New York, 248 AD2d 201, 202-203 [1st Dept 1998].)
The nature of the claim, whether the offending party is the plaintiff or defendant, or even the absence of wilftdness or bad faith are not the determinative factors. The “negligent loss of evidence can be just as fatal to the other party’s ability to present a defense”. (Squitieri v City of New York, 248 AD2d 201, 203 [1st Dept 1998], supra.) Rather, the essential issue is the resulting “[prejudice to the adversary”. (Hoenig, Two Recent *13 Spoliation Decisions, NYLJ, Apr. 13, 1998, at 3, col 1, at 6, col 4.)
The sanctions are applicable “[u]nder New York law * * * where a litigant * * * negligently, disposes of crucial items of evidence involved in an accident before the adversary has an opportunity to inspect them.” (Kirkland v New York City Hous. Auth., supra, at 173.)
The defendants assert no spoliation sanction is applicable because an action had not been commenced, or because the spoliator could not have anticipated litigation at the time of the destruction. However, the Appellate Division has cited the application of such sanctions with approval “even when the evidence was destroyed prior to the action being filed (see, e.g., Stubli v Big D Intl. Trucks, 107 Nev 309, 314, 810 P2d 785, 788 [Sup Ct 1991]; Graves v Daley, 172 Ill App 3d 35, 38, 526 NE2d 679, 681 [App Ct 1988] * * *)”. (Kirkland v New York City Hous. Auth., supra, at 174-175.) An “obligation to preserve evidence even arises prior to the filing of a complaint where a party is on notice that litigation is likely” (Turner v Hudson Tr. Lines, 142 FRD 68, 73 [SD NY 1991]).
The defendants further contend that the sanction is not applicable because a “nexus” has not been shown between the object and the inference to be drawn from its destruction citing Turner (supra) and Skeete v McKinsey & Co. (1993 US Dist LEXIS 9099 [SD NY, July 7, 1993, Leisure, J.]). In those cases the courts found that the documents destroyed were not proven to be likely to contain any information on the relevant issues and therefore the requested inference was not appropriate. Here the preservation and testing of the wood would not only contain the relevant information on the condition of the wood, but would be dispositive of it. The “nexus” can also be found in the rationale of a res ipsa loquitur situation. (1A PJI3d 291 [1998 ed].) “ ‘ “[T]he event [is] of a kind which ordinarily does not occur in the absence of someone’s negligence” ’ ” (Prince, Richardson on Evidence § 3-142, at 96 [Farrell 11th ed]).
Even though the resulting prejudice to the adversary is the paramount consideration, the court also needs to “evaluatfe] the reasonableness of the nonpreserving party’s conduct”. (Kirkland v New York City Hous. Auth., 236 AD2d 170, 175, supra, citing Langley v Union Elec. Co., 107 F3d 510 [7th Cir 1997].)
Here, the emergency situation, the urgent need to clear the road, and to restore the electricity to the residents and the nearby hospital militate towards a finding that the destruction *14 was not intentional. A destruction is “intentional” for these purposes “where the destroyer intended to prevent use of the evidence in litigation”. (Turner v Hudson Tr. Lines, supra, at 74.)
However, on the other hand, the existence and immediate early dispatch of a “risk management team”, consisting of very experienced claims adjusters and investigators, who selectively took six pictures of the auto including the license plates, the blood-stained interior and pictures of the pole on top and in the vehicle does show a high degree of awareness of the likelihood of possible litigation, and supports a finding that “crucial evidence was negligently destroyed”. (Kirkland v New York City Hous. Auth., supra, at 173.) Despite the immediate response taken by the risk management team of R.G.&E., they took no steps to preserve the most critical and crucial evidence, which would have been dispositive of the case. The experienced claims investigators of the defendant R.G.&E. “knew or should have known that the destroyed documents were relevant to pending or potential litigation.” (Capellupo v FMC Corp., 126 FRD 545, 551 [D Minn 1989], citing National Assn. of Radiation Survivors v Turnage, 115 FRD 543, 557 [ND Cal]; Thompson Co. v General Nutrition Corp., 593 F Supp 1443, 1455; Struthers Patent Corp. v Nestle Co., 558 F Supp 747, 765 [D NJ 1981]; Bowmar Instrument Corp. v Texas Instruments, 25 Fed R Serv 2d [Callaghan] 423, 427 [ND Ind 1977].)
Further, the falling of only 14 poles, while eight others in close proximity and many others in the storm area in Monroe County remained standing, should have alerted an experienced investigator to at least the possibility of other causes, including defective wood. The affidavit of Mr. Powell shows such knowledge. Mr. Powell states, “It was not clear * * * whether the severe weather alone had caused the poles to fall.” (Powell affidavit No. 9 [emphasis added].) He indicates a conclusion was only later arrived at, “Eventually, it was determined that the severity of the wind and the accumulation of ice had caused the poles to fall.” (Powell affidavit No. 9 [emphasis added].) The affidavit does not indicate how they ruled out defective wood without at least some testing or evaluation. It was reasonable to expect that just as they sought to rule out causes other than the storm, the injured party would reasonably anticipate the same.
The plaintiffs seek summary judgment based upon defendants’ conduct. In some cases, the courts have granted such dismissal to the adversary as “a matter of elementary fairness” *15 for the following reason: “Although dismissal is the most severe sanction and precludes adjudication on the merits, ‘[t]he stark result is that relevant evidence was irreparably lost by the actions’ of the party basing a claim on that evidence (Capitol Chevrolet v Smedley, 614 So 2d 439, 443 [Ala Sup Ct 1993]). There is a view that destruction or loss of evidence should be ‘rendered costly enough an enterprise that it will not be undertaken’ (Sempert, Remedies for Spoliation of Evidence in Product Liability Litigation, 19 Prod Safety & Liab Rep [BNA] [No. 21] 618 [May 24, 1991]) inasmuch as it ‘often leaves the offended party prejudicially bereft of appropriate means to confront a claim with incisive evidence and turns trials into speculative spectacles based on rank “swearing contests”.’ (Hoenig, Products Liability, Impeachment Exception; Spoliation Update, NYLJ, Apr. 12, 1993, at 6, col 5).” (Kirkland v New York City Hous. Auth., supra, at 174.)
The court finds that under the circumstances of this case, especially in view of the possibility of a superseding, intervening and unforeseeable cause, the remedy of summary judgment is too extreme. The court, however, does find that the remedies forged by the Courts in Strelov (171 AD2d 420, supra) and Neace v Laimans (951 F2d 139 [7th Cir 1991]), and their rationale, are applicable here. Accordingly, the plaintiffs are entitled to the application of the doctrine of res ipsa loquitur, that is, a presumption at trial of negligence against the defendants R.G.&E. and OTC.[1] The defendants are also precluded from offering evidence[2] in defense of that presumption, except to the extent such presumption can be rebutted through the samples *16 of pole No. 103 which were not destroyed. The defendants may also rebut the presumption by proof that the accidents were caused by the unforeseeable intervening storm sufficiently strong enough to knock over even nondefective wood poles.

. Although the facts would need to await their introduction at the time of trial, it is likely that even if the court were to deny the plaintiffs’ motion entirely, the plaintiffs would still be entitled to:
(1) a presumption of negligence based on res ipsa (PJI3d 2:65),
(2) a favorable inference based on destruction of evidence (PJI3d 1:77.1), and
(3) an adverse admission of defendant by conduct (PJI3d 1:56).

. The evidence submitted with the motion papers shows that testing on these poles was performed in 1992 by Osmose at the direction of R.G.&E. There is a disagreement as to what those records prove as to the condition of the wood of pole No. 103 in 1992. It is undisputed the pole failed the Shigometer test indicating the possibility of decay. Upon such failure the standard procedure is to do a boring to test the inner core wood of the pole. The documentation does not clearly state that the subsequent boring tests were done to determine the extent of decay, if any. For instance, for some poles there is a “y” under the first test followed by a printed dot under the following designated tests. Defendants maintain that a “y” for the first test followed by dots means by way of the dot that all the tests above the dot were conducted and nothing adverse was found. On other poles the first test has a *16 dot also followed by a series of dots under the following designated tests. Defendants maintain this means by way of the dot that the designated tests above the dot were not conducted. Further, there are poles showing a “y” followed by dots, then a “y”, a dot and a “y”. Defendants have not explained the inconsistency of why the “y” is necessary if the dots following the first “y” were intended to indicate that the test was completed. On the other hand, plaintiffs maintain that the “y” indicates that a test was done, and the dot indicates a test was not done. Plaintiffs allege this supports their contention that defendants failed to conduct the proper test on the subject pole No. 103 after the Shigometer test showed the possibility of decay and, thereby, is proof that the pole was defective, and known to be so.
Accordingly, due to the sanction resulting from the negligent destruction of the wood by the defendants, which would have shown its actual condition in 1994, the defendants may not introduce such evidence of the condition of pole No. 103 in 1992 to prove its later condition in 1994. However, if the plaintiffs seek to affirmatively use the said evidence to prove that the defendants were negligent in being alerted to and then failing to properly test for decay in 1992, or to assert defendants did not reasonably inspect or test the poles, then the defendants may introduce their evidence to disprove the same, notwithstanding the preclusion.