**NATIONAL ASSOCIATION OF RADIATION SURVIVORS, et al., Plaintiffs,**

v.

**Thomas K. TURNAGE, et al., Defendants.**

**No. C–83–1861 MHP.**

United States District Court, N.D. California.

April 29, 1987.

James J. Garrett, Gordon P. Erspamer, Michael F. Ram, Morrison & Foerster, San Francisco, Cal., for plaintiffs.

George C. Stoll, Asst. U.S. Atty., Civ. Div., San Francisco, Cal., Theodore C. Hirt, Gena E. Cadieux, Merrill Hirsh, Richard A. Hertling, Anne Gulyassy, Thomas Peebles, Attys., Dept. of Justice, Civ. Div., Federal Programs Branch, Washington, D.C., Donald E. Zeglin, Deputy Asst. Gen. Counsel, Veterans Dept., Washington, D.C., for defendants.

## OPINION

PATEL, District Judge.

Plaintiff class is comprised of veterans exposed to ionizing radiation during their service with the United States armed forces, who now allege that the Veterans Administration's claims adjudication procedure violates due process. The matter is currently before the court on plaintiffs' motion for an award of sanctions following the V.A.'s alleged destruction and nonproduction of documentary evidence responsive to various discovery requests.

After a series of hearings on plaintiffs' earlier motions for restraining orders and sanctions, the court determined that an evidentiary hearing was required to establish whether defendant's conduct was sanctionable. On December 3, 4, and 5, 1986, the court heard testimony from a number of the defendant's employees involved in discovery compliance and document destruction. On the basis of the testimonial and documentary evidence presented at that hearing, the court issued a bench order on January 8, 1987, granting plaintiffs' motion for sanctions. This written order memorializes the court's ruling from the bench.

## I. BACKGROUND

As set forth in the court's order dated November 26, 1986, plaintiffs' counsel received an anonymous letter on July 11, 1986, indicating that the Compensation and Pension Service ("CPS") of the Veterans Administration was in the process of destroying a significant number of documents relevant to this action. Plaintiffs subsequently sought a temporary restraining order enjoining further document destruction, and an order to show cause why the restraining order should not be made permanent. On July 18, 1986, the court granted plaintiffs' application.

After hearing on the order to show cause, the court entered a permanent protective order on September 26, 1986. The order issued upon plaintiffs' undisputed showing that during June and July 1986, the CPS destroyed numerous discoverable documents relating to the processing of veterans' benefits claims, and had planned to destroy additional documents specifically relating to the claims of ionizing radiation victims. Only the entry of the temporary protective order saved these clearly relevant materials from destruction. Counsel for the defendant explicitly conceded that the document purge reached relevant and discoverable material; he stated before the court on September 26, 1986, that "all sorts of documents, some of which could have been considered relevant and discoverable, have been and are being destroyed." R.T. at 5.

It remained to be determined whether the defendant's document destruction was willful, reckless, or merely the inadvertent result of office housecleaning. At the hearing on the permanent protective order, the parties submitted conflicting deposition testimony regarding the motivation for the document destruction. Defendant claimed that the document destruction was part of an innocent filekeeping process, completed prior to the receipt of plaintiffs' Eighth Request to Produce Documents (which sought a number of the purged documents). Plaintiffs countered with evidence suggesting that the document purge took place after the receipt of the discovery request, and was either an attempt to evade discovery or a reckless abrogation of the defendant's pretrial responsibilities.

The court determined that the extent and motivation of defendant's document purge could not be established without an evidentiary hearing. Accordingly, the court ordered that the employees of the CPS who participated in the document destruction appear at a hearing to testify before the court.[1] Pursuant to that evidentiary hearing, the court now enters findings of fact, conclusions of law, and sanctions.

## II. FINDINGS OF FACT

There are three primary allegations made by the plaintiff class: (1) that discoverable documents were destroyed or never produced;[2] (2) that the destruction of documents postdated defendant's receipt of the eighth document request; and (3) that defendant's overall failure to comply with discovery requests was intentional or reckless, and was concealed in part by threats of retaliation. The court enters findings of fact with respect to each.

### A. Discoverability of the Destroyed or Unproduced Documents

*Destroyed Documents in the Field Operations General Files*

1. The first category of documents destroyed during the summer of 1986 were the general files of the Compensation and Pension Service's Field Operations staff. Vivian Drake, secretary to the CPS's Assistant Director for Field Operations, Michael Dunlap, maintained these files and conducted the purge of their contents. She stated that she "glanced through" the files and cleaned them out on the basis of age, using a V.A. publication providing guidelines for document retention. R.T. at 18, 19. While Drake could not identify the specific time frame utilized, she suggested that she had destroyed documents over two years old. R.T. at 21. Drake stated that

---

1. In the period preceding the evidentiary hearing it became apparent that the issue of document destruction was only one aspect of a larger pattern of potentially sanctionable pretrial behavior on the part of the defendant, including its repeated failure to produce documents clearly responsive to plaintiffs' various discovery requests. The court therefore took additional testimony at the hearing on the issue of discovery compliance.

2. As observed above, defendant's counsel has already conceded that the document purge destroyed relevant and discoverable material. Thus, plaintiffs' showing with respect to the purge of relevant documents goes only to the extent, rather than the fact, of such impermissible destruction.

everything she threw out had first been approved by Dunlap. R.T. at 20.

2. Ms. Drake testified that the general files contained interstaff correspondence within the V.A., internal memoranda generated by the Compensation and Pension Service, and staff analyses of field stations. R.T. at 18–19. The originals of the staff analyses are kept in the Field Operations general files, while additional copies are maintained in the Field Operations operating files and the regional offices. R.T. at 28. Dunlap stated that the staff analyses in the general files date back to the late 1970s and early 1980s. R.T. at 175. Drake testified that she destroyed none of these. R.T. at 28. Dunlap concurred. R.T. at 157. Dunlap testified that the general files also contain various blank forms and a "history" file. *Id.* The specific content of the forms and the history files was not established.

3. Drake averred that she recalls absolutely nothing about the specific documents which were destroyed, and would state only that no staff analyses were thrown out. Dunlap, who reviewed each document prior to its destruction, evinced a similar absence of memory. Drake's virtually complete lack of any specific recollection regarding the nature of the documents she destroyed only a few months earlier, and her highly nervous and recalcitrant demeanor on the stand, cast serious doubt upon the credibility of her testimony. Unfortunately, Drake and Dunlap are the only individuals competent to testify to the specific documents destroyed, and their refusal or incapacity to do so precludes a determination of the specific relevance of the documents destroyed in the Field Operations general files.

*Destroyed Documents in the Field Operations Operating Files*

4. The Field Operations operating files were purged by consultants Stephen Tomasek, Doug Bissell, and Allen Zinn. Bissell estimated that he purged approximately half the contents of the files for which he was responsible—enough to fill approximately three to four government-issue garbage cans. R.T. at 311, 316–17. Zinn and Tomasek both testified that they used a 1980 cutoff date for purging documents, although both also testified that pre–1980 documents were saved if the consultants considered them particularly significant. R.T. at 219, 482. The documents destroyed were up to twenty years old; the permanent files apparently had not been purged in at least a decade. R.T. at 217, 310.

5. The operating files are maintained on a station-by-station basis for each of the 58 regional offices of the Veterans Administration. R.T. at 49. For each station, the operating file contains a permanent and temporary file. Of the three consultants purging these files, only Bissell purged the temporary files; the other two consultants focused exclusively on the permanent files. R.T. at 293, 309, 473.

6. The temporary files contain the raw data for the summary documents contained in the permanent files. This raw data includes a variety of documents. Exception sheets, generated by the CPS's Quality Review staff through random reviews of claim files in regional offices, R.T. at 137–38, contain analyses of processing errors found in individual cases. R.T. at 137. Each contains a claim number, the claimant's name, an "end product" indicating the agency action, the error made, and a notation of what should have been done. *Id.* By the terminal digit of the "end product" code, exception sheets can be linked to radiation claims. R.T. at 193. Three copies of these sheets exist: one in Quality Review, one in the Field Operations temporary operating file, and one in the regional office claim file. R.T. at 97–98. While two of the consultants did not purge the temporary files, the files are nonetheless maintained by CPS staff for only one year. Since Quality Review also retains its copies of exception sheets for no more than a year, R.T. at 189, the only available copies, if any, of exception sheets older than one year are contained in the various regional offices. It is doubtful that these copies are practically obtainable.

7. The temporary files also contain local "Systematic Quality Control" information and reports of corrective actions taken by regional offices in response to inquiries from the CPS central office. R.T. at 310. This data is also destroyed on a yearly basis, and is not otherwise practically obtainable.

8. The permanent files contain a variety of documents which are assembled from the raw data contained in the temporary files. These include staff analyses and site surveys of regional offices. R.T. at 46–47, 136. The permanent files also contain general correspondence between regional offices and the Field Operations central office staff. R.T. at 26. Staff analyses are prepared twice a year at the central office on the basis of information submitted from the regional offices. An analysis includes a "review of end product timeliness, average delay time to establish target claims, quality review, ... and assessment of the station's productivity statistics." R.T. at 136. Of the consultants, Tomasek purged the permanent files of all staff analyses more than one year old, while Zinn threw out none. R.T. at 221, 482. The original copies of the analyses are kept in the Field Operations general files. Dunlap testified that these originals were not purged, so the information remains available.

9. Site surveys differ from staff analyses insofar as they represent the findings of an actual visit to a regional office. R.T. at 46. Site surveys review a regional office's adherence to V.A. regulations governing the adjudication of benefits claims, and comment on due process violations. R.T. at 46–47. Copies of the site surveys are kept only in the permanent operating files. R.T. at 295. Zinn and Bissell testified that they preserved all site surveys. R.T. at 313, 482. Tomasek threw out all but the last two site surveys, which are prepared from once a year to once every eight years. R.T. at 295–96. The site surveys purged by Tomasek, some possibly only two years old, are thus irretrievably lost.

10. Other information in the permanent files includes inspector general reports and correspondence between the central and regional offices regarding corrective actions. Additional copies of this correspondence are found only in the files of the particular regional office which generated or received it. R.T. at 168. Tomasek testified that he generally did not throw out any corrective action correspondence, though he "might" have. R.T. at 219–20. Tomasek admitted destroying an anonymous letter in a permanent file critical of Mr. Thomas Verrill, an adjudication officer in Philadelphia and later in San Francisco. R.T. at 224. Tomasek threw out inspector general reports, claiming that they are now maintained elsewhere in the Compensation and Pension Service; Bissell stated that he threw none away. R.T. at 246, 313. While Zinn and Bissell both stated that they threw out only mundane and outdated correspondence and forms, R.T. at 325, 483, and while Tomasek asserted to others within the CPS that he purged nothing of importance, R.T. at 102, Bissell admitted that there "may have been some quality control issues regarding due process that may have been destroyed." R.T. at 338. It is thus highly probable that relevant documentary evidence, including agency correspondence, was destroyed by the consultants. Copies, if any, exist only in the files of the various regional offices, and in all likelihood are not practically obtainable.

*Nearly-Destroyed Ionizing Claim Documents*

11. Twelve boxes of ionizing claim documents located in the Advisory Review offices of the Compensation and Pension Service were spared from destruction in July 1986 by this court's temporary restraining order. R.T. at 166. The boxes allegedly were to be destroyed to create more office space. R.T. at 185. The boxes contained requests made to the Defense Nuclear Agency, the Department of the Navy, and the Department of the Army regarding the radiation exposure of particular veterans. R.T. at 162. The documents contained the names of the veterans, their service numbers, the V.A. claim file numbers, and the

responses from the various agencies regarding the claimants' radiation exposure. *Id.* Some of the documents contained dose estimates. R.T. at 184.

12. These documents are located together only in the offices of the Advisory Review staff; the only other copies are contained in individual veterans' claim files maintained by the various regional offices of the V.A. R.T. at 164. Thus had the destruction taken place, the remaining copies would have been practically unobtainable.

*Unproduced Documents: SIRS and PIF*

13. The Special Issue Rating System ("SIRS") and the Pending Issue File ("PIF") are two V.A. computer systems capable of segregating and identifying the claims of ionizing radiation victims. The existence and capabilities of neither was revealed to plaintiffs until late 1986, though both have existed for a number of years.

14. Gary Hickman, a CPS Assistant Director, testified that SIRS has been used for several years. R.T. at 608. Dunlap knew of SIRS when he worked in the Washington, D.C. regional office of the V.A. in 1985, and testified that PIF has been in effect "a long time. Several years." R.T. at 200–01. Plaintiffs produced a recently-acquired document entitled "DVB Circular 20–82–39," which indicates that the PIF system has been capable of segregating ionizing radiation claims since 1982. R.T. at 553–59.

15. The SIRS field includes the claimant's file number and name, the date of the claim, and the agency disposition. R.T. at 199. Included among SIRS claims are those involving ionizing radiation. R.T. at 200. SIRS is presently capable of segregating ionizing radiation claimants by specific disease. R.T. at 567. Hickman acknowledged that SIRS can readily identify all radiation claimants in whose case a ratings decision has been entered. R.T. at 570.

16. The PIF field includes a file number, end product code, the claimant's "stub" name, the date of filing of the claim, and information regarding the claim's disposition. PIF segregates ionizing radiation claims by the terminal digit of the end product code, and thus can identify all such pending claims. R.T. at 200.

17. Defendant has indicated throughout this litigation that it was incapable of identifying ionizing radiation claimants. *See, e.g.,* Declaration of Jack Nagan, dated May 16, 1983, at 2–3; Defendant's Answers to Plaintiffs' First Set of Interrogatories, dated June 17, 1983, at 1, 11, 13; Defendant's Authorities in Opposition to Plaintiffs' Motion for Class Certification, dated April 1, 1986, at 10 ("no one knows the size of the proposed class [of ionizing radiation claimants]—not plaintiffs, not the Court, and certainly not this Agency.")

18. Defendant's purported inability to provide information regarding ionizing radiation claimants has substantially multiplied the litigation in this matter. Significant among the resulting disputes is defendant's tenacious opposition to plaintiffs' motion for class certification, based in large part on plaintiffs' alleged failure to establish numerosity. *See* Defendant's Authorities in Opposition to Plaintiffs' Motion for Class Certification, dated April 1, 1986.

*Other Unproduced Documents*

19. During the course of the hearing, a number of specific unproduced documents were brought to the court's attention by the plaintiffs. Since it is unclear from which file or office within the CPS they originated, the documents are listed individually. These include, in part: (a) correspondence between the central office and the St. Petersburg regional office regarding hearings and due process; (b) various papers on due process trends, problems, and policies, prepared by CPS legal consultant Ronald Abrams, R.T. at 409–10; (c) a manual form change altering "the error call for failure to provide due process," triggered by extensive correspondence from regional offices regarding difficulties they had experienced in evaluating this problem, R.T. at 412; (d) a CPS file dealing

with "end product abuse," apparently containing a memorandum revealing 47,995 extra end products entered by at least fifteen regional offices, R.T. at 413, 449; (e) a CPS file entitled "Due Process," R.T. at 549; (f) DVB Circular 20–82–39, discussed above with reference to PIF; (g) a letter from Gerald Moore, the Director of the CPS, to regional offices regarding the process of adjudicating ionizing radiation claims and the implications of 38 C.F.R. 3.311B, governing such adjudication, R.T. at 576; (h) a number of circulars describing SIRS and its various capabilities, R.T. at 563 *passim;* and (i) a series of three training letters from Mr. Moore to regional offices, discussing various procedural shortcomings in claims processing, R.T. at 617.

B. *Timing of the Document Destruction Vis-a-Vis Receipt of the Eighth Document Request*

20. Plaintiffs served defendant with their eighth document request on June 25, 1986. Plaintiffs allege that this request specifically sought a number of the destroyed documents. *See, e.g.,* Plaintiffs' Eighth Request to Produce Documents, Request Nos. 3, 6.

21. Vivian Drake testified that soon after being hired, she discussed with Dunlap the possibility of cleaning out and organizing the Field Operations general files. This conversation took place somewhere between October 1985 and April 1986; Drake could offer no greater specificity. R.T. at 27. Dunlap stated that he told her to work on cleaning out the files on a "time available basis" when he hired her. R.T. at 181. Though Drake had nearly no recollection regarding the date of the second conversation with Dunlap that specifically led to the document destruction, Drake's affidavit dated August 4, 1986, places the conversation in June 1986.

22. Drake demonstrated a similar failure of recollection with respect to the time period during which she actually conducted the purge of the general files. R.T. at 22. She left for another job on July 11, 1986, and stated that she could not remember

whether she continued to work on the files until her departure. R.T. at 21. In her earlier deposition, she indicated that she worked on the file purge until she left. Drake Dep. at 55. Dunlap recalls that Drake worked on the purge up until the time she transferred, and recalls that she worked on it while he was gone in early July. R.T. at 156, 195. Drake's purge of the general files thus can be reasonably placed after defendant's receipt of the eighth document request.

23. The date of the consultant's purge of the operating files is the subject of contradictory testimony. The consultants testified that the purge of the operating files was initiated by Vivian Drake, who had received authorization from Dunlap. They testified that Drake wanted to have the operating files thinned out because of their increasingly unwieldy bulk. R.T. at 242–43. Drake passed Dunlap's authorization along to Tomasek, who testified that the conversation took place in mid-June. R.T. at 238.

24. Tomasek, Zinn, Bissell, and Dunlap all related nearly identical stories placing the subsequent document destruction during a short period in the middle of June, well before the receipt of the eighth document request. All testified that the document destruction began during the absence of Dunlap and Fay Norred, a supervisor in Field Operations, who was on vacation from June 10 through June 25. This apparently was her only absence. R.T. at 509. Dunlap was in Los Angeles from June 11 through June 13. R.T. at 160. They claimed that the operating file purge was conducted during a fairly short period of time, and was finished well before June 25. R.T. at 175, 236.

25. The evidence suggesting a later starting date, possibly after receipt of the eighth request, stems largely from the testimony of Barry Boskovich, a consultant working on the Adjudication Procedures staff of the CPS. Boskovich testified that he had two conversations with Tomasek about the purge—one in late June and another on July 7. R.T. at 49–50. The sec-

ond conversation, which took place with Bissell present, occurred after Boskovich had seen portions of the eighth document request. He teased Tomasek, who had worked in Baltimore, about the inclusion of the Baltimore office in the discovery request, and got the "impression" over the course of the conversation that the purge was continuing. R.T. at 52. In earlier deposition testimony, Boskovich was far more direct in his description of Tomasek's admission that documents had been destroyed after receipt of the request. *See* Boskovich Dep. at 14, 58, 65. Boskovich subsequently corrected these deposition statements and rendered them far more guardedly. He explained the changes as clarifications of those statements which he "didn't know for a fact," and which resulted from the confusion of his two conversations with Tomasek. R.T. at 108–09. The court observes that significant evidence exists of employee intimidation and harassment. *See infra* paragraphs 43 through 45. Boskovich's shifting testimony must be considered in light of this intimidation.

26. In the second conversation, Boskovich raised the question of the propriety of the purge in light of the request, and Tomasek reportedly indicated that he had not seen the request, that he had done nothing wrong, and that the documents that he had thrown out were unimportant. R.T. at 69–70. Larry Nicholson, a supervisor within the CPS who had been present for some of the conversations, confirmed in his testimony that Tomasek stated he had done nothing wrong. R.T. at 347. There is agreement that Tomasek never denied that the purge of documents continued after receipt of the eighth document request. R.T. at 56–57, 346–47. Nicholson concluded, as did Boskovich, that on the basis of Tomasek's comments during various discussions, destruction of documents proceeded after receipt of the eighth request. R.T. at 370–71.

27. Two other considerations cast doubt on Tomasek's rendition of the events. In his deposition on August 25, Tomasek stated that the purge began two to three weeks prior to the date when he gave his initial affidavit, which was conducted on August 1, 1986. R.T. at 238. This deposition testimony placed the purge during the first few weeks of July. Tomasek subsequently testified that this was an "anomaly" in light of his testimony placing the purge in mid-June. *Id.* Second, the initial affidavits given by the three consultants were drawn up only after they had consulted among themselves regarding the date of the document purge. R.T. at 229, 319–20. The resulting affidavits are essentially identical, and wholly exculpatory.

28. While the date of the document purge cannot be identified with a high degree of specificity, and while there is substantial contradictory testimony regarding its occurrence, there is significant circumstantial evidence that the document purge continued after defendant's receipt of the Eighth Request for Documents.

29. Dunlap approved the shredding of the twelve boxes of ionizing claim documents in mid-July, well after receipt of the eighth request and following extensive discussion of this litigation within the Compensation and Pension Service. R.T. at 165. Only Dunlap's conversation with a number of CPS officials on July 21 or 22, in which he was instructed to save the documents pursuant to this court's temporary restraining order, halted the plans for destruction from proceeding. R.T. at 166. These events occurred indisputably after Dunlap and others in the CPS had significant knowledge of this lawsuit.

C. *Evidence of Culpable Intent in the Destruction and Nonproduction of Documents*

30. Plaintiffs have offered significant evidence of the defendant's culpable intent in its pattern of noncompliance with discovery requests. This intent is reflected in two areas: evidence of CPS officials' failure to establish any systematic process to comply with plaintiffs' discovery requests, and evidence of the officials' affirmative attempts to stifle full compliance with discovery requests and disclosure to the court of past inadequacies.

*Absence of a Systematic Compliance Procedure*

31. Gary Hickman was the individual responsible within the Compensation and Pension Service for coordinating discovery compliance. R.T. at 611. He is a lawyer, and testified to possessing a full understanding of the issues involved in the litigation. R.T. at 516, 612.

32. Despite his knowledge and his background, Hickman did nothing to systematically assure compliance with plaintiffs' discovery requests. He has no recollection of giving any instructions to his staff regarding discovery compliance. R.T. at 613. His procedure was to send a portion of a particular discovery request to the head of a particular department within the CPS, and leave it to the supervisor to interpret the request and provide the information. R.T. at 614. Hickman has never instructed his staff to contact each department head within the CPS regarding each discovery request. R.T. at 530. This procedure apparently has not yet been changed. R.T. at 458.

33. Ronald Abrams testified that because of this process, a number of individuals possessing information responsive to the document requests have never seen the requests. R.T. at 452–53.

34. After a supervisor prepared a response, Hickman simply would read it, along with the request. He did nothing to verify the sufficiency of the response. R.T. at 614–15. Hickman admitted that his level of knowledge regarding the contents of the various departmental files was inadequate to determine whether the response was complete. R.T. at 614.

35. Hickman has maintained no records of the discovery produced, so he is incapable of verifying whether or not any particular documents have been provided to the plaintiffs. R.T. at 615.

36. Either as a result of their misrepresentation or Hickman's failure to inform the personnel in Field Operations of the substance of this litigation, Drake, Dunlap, Bissell, and Zinn all testified to varying degrees of ignorance about the lawsuit. R.T. at 26, 142–43, 326, 489. While most claimed that they knew the case involved radiation claims and the statutory ten dollar attorneys' fee limit, none testified to any familiarity with the due process claims made in the litigation.

37. Tomasek testified to a greater understanding of the lawsuit. He stated that he knew the litigation dealt with due process issues, since Abrams constantly "harps" on the subject and brought it to Tomasek's attention when he worked in a regional office during 1984. R.T. at 288–89. Larry Nicholson, to whom Dunlap delegated his portion of the response to the eighth document request, R.T. at 145–46, also testified to a more extensive understanding of the litigation. In 1984 he had participated in document collection pursuant to an earlier discovery request. R.T. at 341–42.

38. Dunlap and Drake testified to remarkable levels of ignorance. Drake claimed never to have heard of the case. R.T. at 26. Dunlap stated that he first learned of the case this year, and did not know in June 1986 that the lawsuit involved the ten dollar fee limitation or benefits claims by atomic bomb test survivors. R.T. at 143–44, 171. These and other claims of ignorance regarding the litigation must be considered in light of Tomasek's observation that "the NARS case is felt throughout the V.A. Everyone knows about the NARS case." R.T. at 288. Additionally, Hickman testified that he knew both Dunlap and Ted Spindle—another assistant director within the CPS—were well aware of the issues in the NARS litigation. R.T. at 519; Hickman Dep. at 56.

39. Once informed of the substance of the lawsuit, the Field Operations supervisors exhibited the same kind of disregard for the sufficiency of their staff's particular responses as Hickman exhibited for the overall response of the Compensation and Pension Service. Nicholson, a lawyer who was responsible for the Field Operations' response to the eighth request, made no attempt after learning of the purge to de-

termine if the documents destroyed in the operating files were responsive to it. He suggested that it was not his problem and declined to investigate after consultants Boskovich, Abrams, and Thomas Kenny all specifically expressed concern to him about the document destruction and its implications for the discovery request. R.T. at 79, 350, 353–54.

40. Dunlap also made no attempt to investigate the responsiveness of the destroyed documents after receiving the eighth request. R.T. at 161. Neither did he initially provide the consultants with any criteria for their purge of the files, or check to see if there existed copies of the destroyed documents in other files. R.T. at 215–16. This lack of inquiry followed distribution within the CPS of copies of the anonymous "deep throat" letter to plaintiffs' counsel, which specifically suggested that the document destruction was an attempt to thwart discovery requests. R.T. at 146–47. When Boskovich went to Spindle, supervisor of the adjudication procedures staff, he similarly refused to do any follow-up, stating that it was a field operations problem. R.T. at 66.

41. Perhaps the most striking disregard of the discovery process was Dunlap's approval of the destruction of twelve boxes of ionizing radiation claims data in mid-July. After testifying that he "may have assumed" prior to June 1986 that this lawsuit dealt with the adjudication of ionizing radiation claims, R.T. at 143, after testifying that extensive discussions regarding the litigation occurred within the CPS in early July 1986, R.T. at 147, and after testifying that as of July he knew that documents contained within the boxes slated for destruction were crucial to the adjudication of ionizing radiation claimants, R.T. at 163, Dunlap weakly asserted that he did not think the boxed documents had any relation to the issues involved in the litigation. R.T. at 186. This demonstrates either a complete and reckless disregard of discovery obligations or a very poor attempt to disguise the intentional destruction of relevant documents.

42. Hickman's wholly unpersuasive attempts to explain the V.A.'s inadequate responses to various document requests are equally troubling, and point in the same direction: either he made no effort to understand and then to respond to the requests in good faith, or he concealed responsive documents and now vainly attempts to sanitize the omissions. *See* R.T. at 538–46.

*Encouragement and Concealment of Noncompliance and Destruction*

43. Even more troubling than evidence of the defendant's disregard of its obligations to fully comply with discovery requests is evidence of its affirmative attempts to stifle such compliance and its employees' subsequent cooperation with this court's inquiry into discovery violations. A number of individuals testified to efforts made by various CPS officials to restrain full disclosure of information—efforts which included threats of retaliation.

44. When Thomas Kenny went to Ted Spindle with his concerns that documents were being destroyed which were responsive to discovery requests, he was told to "keep his nose out of it." R.T. at 379. In Boskovich's first deposition, he stated that Spindle had similarly told him to "stay out of it" after Boskovich went to him with his concerns. Boskovich Dep. at 49. Boskovich later deleted this statement—but left in its repetition only a few lines later. Boskovich later repeated in testimony that Spindle had told him to "stay out of it," not to put anything in writing, to come to him if he discovered additional information, and not to talk with anyone else. R.T. at 112. In a transparent threat of retaliation, Spindle indicated that Boskovich should focus his attention and concerns not on the agency, but on himself and his family. *Id.*

45. Similarly, Ronald Abrams was told by Deputy Director Herbert Mars, Hickman, and Spindle not to put anything in writing after he expressed concerns about discovery noncompliance. R.T. at 411–12. Abrams presently fears retaliation from Dunlap for his role in exposing due process violations within the V.A. R.T. at 395.

Dunlap tore apart and discarded one of Abrams' previous memoranda on due process violations, contending that it was inappropriately critical of regional offices; he was known to Abrams as having little concern for "documentation of due process and providing full notice." R.T. at 402, 404.

46. Finally, Tomasek has now stopped attending the coffee-break discussion group of which he previously was a part, because "he feared someone he might talk to would give information away," according to Boskovich. R.T. at 64. Tomasek claimed that he stopped going simply to comply with the court's sealing order. R.T. at 241.

47. Boskovich offered testimony suggesting that individuals in positions of greater authority within the V.A. were aware of attempts to thwart discovery and this court's investigation. In a conversation between Boskovich and his immediate supervisor, Dale Rice, Boskovich reported the document destruction and his concerns about its relation to the outstanding discovery request. Rice replied that "the third floor knows." R.T. at 66. Abrams indicated that the "third floor" suggests the offices of the Chief Benefits Director and his staff. R.T. at 424.

48. While it remains unclear how extensive or coordinated was the attempt among the supervisorial staff of the V.A. to stifle disclosure of discovery violations, there is convincing evidence that a number of individuals in positions of authority willfully attempted to thwart this court's investigation of possible improprieties relating to the CPS's destruction and nonproduction of relevant evidence. An inference of conscious intent in the first instance to destroy responsive documents, though, is inconsistent with the haphazard and essentially uncoordinated nature of the document purge.

## III. CONCLUSIONS OF LAW

■ Given this factual record, the court concludes that the Veterans Administration has acted in a sanctionable manner in a variety of respects. First, its failure to provide documentary evidence clearly responsive to multiple requests made by plaintiffs during the course of discovery is sanctionable under Fed.R.Civ.P. 11 and 26(g) insofar as the discovery responses, as well as subsequent motions and papers based on those responses, did not reflect a reasonable inquiry on the part of defendant and its counsel. Second, sanctions for the destruction of potentially discoverable documents, regardless of whether they were specifically responsive to outstanding discovery requests, are an authorized exercise of the court's inherent power to preserve and protect its jurisdiction and the integrity of proceedings before it. Third, plaintiffs' costs in bringing motions for temporary and permanent protective orders to spare discoverable documents from destruction are recoverable under Fed.R.Civ.P. 37(a)(4) as expenses incurred to compel discovery.

■ While evidence that the defendant acted willfully or recklessly in thwarting discovery and this court's subsequent investigation into alleged improprieties is neither required to sanction the defendant's conduct under Rules 11 and 26 nor grounds for additional sanctions apart from those outlined above, it nonetheless is relevant to the determination of the particular measures imposed to deal with the defendant's various transgressions.

### A. Sanctions for the Nonproduction of Responsive Documents Under Rules 11 and 26

■ Under Fed.R.Civ.P. 11, an attorney who signs any pleading, motion, or other paper certifies that he or she has established, after reasonable inquiry, that it is "well grounded in fact." The rule

> was designed to create an affirmative duty of investigation as to law and as to fact before motions are filed. It creates an objective standard of "reasonableness under the circumstances." This was intended to be a standard "more stringent than the original good faith formula" so "that a greater range of circumstances will trigger its violation."

*Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1536 (9th Cir.1986) (citations omitted). If counsel relies on the investigation of preceding counsel or a party, the duty remains to "acquire[ ] knowledge of facts sufficient to enable him to certify that the paper is well-grounded in fact." Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181, 187 (1985).

■ While the rule's language speaks directly to the obligations of certifying attorneys who sign the papers, parties may also be sanctioned under its provisions. As the Advisory Committee observed,

> [e]ven though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client. This modification brings Rule 11 in line with practice under Rule 37, which allows sanctions for abuses during discovery to be imposed upon the party, the attorney, or both.

Fed.R.Civ.P. 11 Advisory Committee's Note (citations omitted).

■ Fed.R.Civ.P. 26(g) contains sanction provisions parallel to those found in Rule 11. The primary distinction is that Rule 26 applies exclusively to discovery requests and responses, while Rule 11 applies to any paper, pleading, or motion. Rule 26(g) thus requires a signing attorney to certify that a reasonable inquiry has been made with respect to the factual and legal basis for any discovery request or response. Fed.R.Civ.P. 26(g) Advisory Committee's Note. The reasonableness of the inquiry is measured by an objective standard; there is no required showing of bad faith. *Id.* While Rule 11 is reserved for those papers, pleadings, and motions for which there are not other applicable sanction provisions, and thus cannot be used to preempt the application of Rule 26(g) to discovery responses and requests, *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830 (9th Cir.1986), its interpretation nonetheless guides the application of Rule 26(g).

■ Plaintiffs have established that the defendant failed to produce clearly responsive documentary evidence over the course of discovery in this litigation. These omissions reflect the consistent failure of defendant and its counsel to conduct reasonable factual inquiries prior to filing various discovery responses and other pleadings, papers, and motions. The omissions are sanctionable under Rule 26(g) where the omitted documents and information should have been disclosed in particular discovery responses, and under Rule 11 where the undisclosed documents and information refuted the asserted factual basis for other motions, pleadings, or papers subsequently filed by defendant.

Defendant's most egregious discovery omission was its failure to produce the SIRS and PIF computer data, which was clearly responsive to numerous requests made by the plaintiffs. Plaintiffs' first request for documents and first set of interrogatories required the production of data within the fields of SIRS and PIF. *See* Plaintiffs' First Set of Interrogatories, Interrogatory Nos. 1, 8, 9; Plaintiffs' First Request to Produce Documents, Request No. 6. The defendant's initial and subsequent responses to these and other discovery requests falsely asserted that data available in the SIRS and PIF systems was only obtainable through a manual review of the virtually millions of individual claim files in the various regional offices of the Veterans Administration. *See, e.g.,* Declaration of Jack Nagan in Response to Plaintiff's First Request to Produce Documents, dated May 16, 1983, at ¶ 4(a):

> Because of the size of the Agency ..., the nature of our record-keeping activities, and the huge number of records involved, it is literally impossible to produce *all* documents in the VA's possession concerning subject matters as broad as those involved in plaintiff's Request. For example, both the material already provided and that which will be provided for the most part, does not include documents prepared locally at a VA Regional Office. These documents could only be obtained by a manual review of all VA

records, including but not limited to the approximately 34 million claims folders located at the 58 field stations, Records Processing Centers and Federal Archive Records Centers.

The defendant asserted as recently as October 28, 1986, that it could not identify the pending ionizing radiation claims before the Veterans Administration—a statement that the V.A. retracted as false on November 18, 1986, after it finally acknowledged the capabilities of the PIF database.

Plaintiffs have brought to the court's attention a number of additional unproduced documents which were responsive to various discovery requests. Based upon defendant's conduct in this litigation, the court must presume that these particular documents, obtained by plaintiffs despite the defendant's noncompliance, represent but a fraction of the responsive materials which defendant controls but has not produced. These documents are enumerated, in part, in paragraph 19 of the Findings of Fact, *supra*. They include analyses and documentation of due process problems prepared by CPS employees, correspondence between regional offices and the CPS central office regarding various due process issues, and circulars describing the capabilities of SIRS and PIF. These documents are responsive to a variety of plaintiffs' discovery requests, including Requests 3 and 6 of the Plaintiffs' Eighth Request to Produce Documents.

The V.A.'s various discovery omissions are directly attributable to the failure of defendant and its counsel to establish a coherent and effective system to faithfully and effectively respond to discovery requests. As detailed in paragraphs 31 through 42 of the Findings of Fact, *supra*, the defendant employed an unconscionably careless procedure to handle discovery matters, suggesting a callous disregard for its obligations as a litigant. As detailed in paragraphs 43 through 48 of the Findings of Fact, *supra*, the attempts of various supervisors to stifle disclosure of potentially nondisclosed and destroyed documents, rather than to vigorously investigate possible noncompliance, accentuates the defendant's profound disrespect for its responsibilities in this litigation.

■ The court concludes that the defendant and its counsel failed in a variety of instances to conduct any reasonable inquiry into the factual basis of its discovery responses as well as the factual basis of subsequent pleadings, papers, and motions based on those responses. Such an inquiry would have required, at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the defendant potentially possessing responsive information, and to account for the collection and subsequent production of the information to plaintiffs. The defendant's failure to institute such a procedure, its attendant failure to produce clearly responsive documents and information, and its subsequent submission of papers, pleadings, and motions based on asserted facts directly refuted by the nonproduced material violate the requirements of Rules 26(g) and 11 and require the imposition of sanctions.

### B. *Sanctions for the Destruction of Relevant and Discoverable Documents Under the Court's Inherent Powers*

■ The court has the inherent authority to sanction a litigant for the destruction of relevant and potentially discoverable documents. As the court in *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443 (C.D.Cal.1984), observed,

[s]anctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information. While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admis-

sible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request. *Id.* at 1455; *see Graham v. Teledyne-Continental Motors,* 805 F.2d 1386, 1390 n. 9 (9th Cir.1986) ("sanctions available to punish those who alter or destroy evidence"); *Struthers Patent Corp. v. Nestle Co.,* 558 F.Supp. 747, 765–66 (D.N.J.1981) (the destruction of documents which the party knew or should have known would be relevant to a lawsuit soon to be filed is sanctionable); *Bowmar Instrument Corp. v. Texas Instruments, Inc.,* 25 Fed.R.Serv.2d (Callaghan) 423, 426–27 (N.D.Ind.1977) (same).

There is no question that relevant documents were destroyed and are now permanently lost; defendant's counsel conceded this in open court. Among the destroyed documents were exception sheets, statistical quality control data, and other information contained in the CPS temporary files; the CPS site surveys thrown out by Tomasek; and certain pieces of agency correspondence, including the letter critical of Thomas Verrill. By the very fact of their destruction, though, the vast majority of the purged documents cannot now be identified. A striking absence of recollection regarding the content and nature of the destroyed documents characterized the testimony of Drake, Dunlap, and the consultants who conducted the purge, and makes the specific identification of the discarded materials even more difficult than it would be otherwise.

■ Needless to say, plaintiffs should not suffer because of this. Where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court must draw the strongest allowable inferences in favor of the aggrieved party. *Cecil Corley Motor Co. v. General Motors Corp.,* 380 F.Supp. 819, 859 (M.D.Tenn.1974). As the court in *Alexander v. National Farmers Org.,* 687 F.2d 1173 (8th Cir.1982), *cert. denied,* 461 U.S.

937, 938, 103 S.Ct. 2108, 2110, 77 L.Ed.2d 313, 314 (1983), observed,

[o]bviously, the relevance of and resulting prejudice from destruction of documents cannot be clearly ascertained because the documents no longer exist. Under the circumstances, [the culpable party] can hardly assert any presumption of irrelevance as to the destroyed documents. On this record, the district court properly could have imposed the most severe sanctions upon [the culpable party]—dismissal of its claims and default judgment.... Nonetheless, we cannot say it was an abuse of discretion not to do so. It was error, however, not to draw factual inferences adverse to [the culpable party] on matters undertaken in or through offices and individuals involved in the destruction of documents.

*Id.* at 1205–06 (citations and footnote omitted). The court therefore infers and concludes that a significant proportion of those materials purged from the CPS general and operating files which now cannot be identifed were either "relevant in the action, ... reasonably calculated to lead to the discovery of admissible evidence, ... reasonably likely to be requested during discovery, and/or ... the subject of a pending discovery request." *Wm. T. Thompson,* 593 F.Supp. at 1455.

■ The court further concludes that the defendant knew or should have known that these destroyed materials were relevant and discoverable. After more than three years of litigation, the V.A. can hardly assert that it was not on notice of the issues involved in this lawsuit. It is no defense to suggest, as the defendant attempts, that particular employees were not on notice. To hold otherwise would permit an agency, corporate officer, or legal department to shield itself from discovery obligations by keeping its employees ignorant.[3] The obligation to retain discoverable

---

3. As noted above in paragraph 38 of the Findings of Fact, there is substantial reason to doubt that the CPS employees were as ignorant of the

substance of this litigation at the time of the document purge as they now claim. Furthermore, it is beyond dispute that the supervisorial

materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials. Certainly at this late stage in these proceedings, the responsibility lies with the Veterans Administration to inform its employees and agents of the substance of the litigation and to assure that relevant and discoverable materials are not destroyed. Far from achieving this objective, the procedure described by Mr. Hickman to manage discovery bordered on the anarchic. The V.A.'s reckless and irresponsible abrogation of its responsibility to assure full compliance with discovery requests cannot be tolerated or excused, and is most assuredly sanctionable where it results in the wholesale destruction of potentially relevant material.[4]

### C. *Fees and Costs Under Rule 37(a)(4)*

Finally, a prevailing party may recover its fees and costs in bringing motions to compel discovery under Fed.R.Civ.P. 37(a)(4). Plaintiffs' motions for temporary and permanent protective orders to spare discoverable and responsive documents from destruction were brought to compel discovery, and all costs and fees incurred to do so are thus recoverable.

## IV. SANCTIONS

By its bench order dated January 9, 1987, this court imposed a variety of measures to sanction the defendant's multiple transgressions and to protect the court's jurisdiction and the integrity of these proceedings. These measures included the reimbursement of plaintiffs and the court for various expenses incurred as a result of

defendant's sanctionable actions, the imposition of a number of requirements for the conduct of further discovery, and the appointment of a special master at defendant's expense to supervise all further discovery. Under the circumstances, the court determined that it was appropriate to direct the sanctions to both the defendant and its counsel, since responsibility for the conduct of the litigation was shared and since culpability could not be accurately apportioned between the two.

The court here details the sanctions ordered from the bench. These measures are without prejudice to subsequent requests by plaintiffs for the imposition of additional sanctions in the form of the exclusion of evidence or the admission of facts.

### A. *Monetary Sanctions*

■ 1. Defendant shall reimburse plaintiffs for all fees and costs incurred in depositions, discovery, preparation, the hearing, and other matters related to the bringing on of this motion for sanctions and of the plaintiffs' earlier motions for temporary and permanent protective orders. Defendant shall reimburse plaintiffs for all fees and costs incurred in ascertaining the documents destroyed during the defendant's purge and in reconstructing them, if possible. Defendant shall reimburse plaintiffs for all fees and costs incurred as a result of the defendant's failure to produce documents and information responsive to various discovery requests, as outlined in paragraphs 13 through 19 of the Findings of Fact, *supra*. This includes but is not limited to the fees and costs incurred as a result of supplemental discovery requests and as a result of the defendant's opposition to the motion for

---

staff of the CPS understood the basis of the litigation by mid-July 1986, when plans to destroy twelve boxes of clearly relevant ionizing radiation claim data were halted only by this court's temporary restraining order. The defendant's protestations of its employees' innocence are thus less than credible.

**4.** To the extent that the documents destroyed were specifically responsive to outstanding discovery requests, sanctions are also appropriate

under Rule 11 insofar as the destroyed documents contradicted the facts asserted in applicable pleadings, papers, or motions, and Rule 26(g) insofar as particular discovery responses failed to include the documents. The destruction of responsive documents is only the most egregious variant of nonproduction, and a reasonable inquiry would have led to their preservation and inclusion in defendant's discovery responses.

class certification based upon the plaintiffs' alleged failure to establish numerosity and impracticability of joinder.

2. On February 23, 1987, the parties stipulated that the fees and costs imposed by the January 9, 1987 bench order shall be satisfied by defendant's payment to the plaintiffs of the sum of $105,000.00. Further inquiry into the actual amount of the monetary sanctions therefore is unnecessary. The matter need not be referred to a magistrate and plaintiffs need not submit any further accounting of fees and expenses.

 3. The defendant shall pay an additional sum of $15,000.00 to the clerk of this court for the unnecessary consumption of the court's time and resources. *Olga's Kitchen of Hayward, Inc. v. Papo,* 108 F.R.D. 695, 711 (E.D.Mich.1985); *Itel Containers Int'l Corp. v. Puerto Rico Marine Management, Inc.,* 108 F.R.D. 96, 106 (D.N.J.1985). In its bench ruling, the court ordered the defendant to pay the money into an extern fund used to compensate unpaid law students who assist in the work of the courts of this district. Defendant moved for reconsideration of that aspect of the ruling, arguing that the provisions of 28 U.S.C. § 751(e) (1982) require all funds received by the clerks of the courts to be paid into the Treasury of the United States. After review of the applicable statutory authority, the court concludes that its prior bench ruling was inconsistent with the requirements of the law and thus modifies the ruling to require that payment be made to the clerk of the court for deposition as required by law.

### B. *Additional Discovery Obligations*

 4. To insure compliance and complete discovery, the defendant shall designate an attorney within the V.A. who shall be responsible at all times for receiving discovery requests, coordinating and preparing their responses, and signing the responses. By submission filed January 21, 1987, in response to the court's January 9, 1987 bench order, the Veterans Administration designated Donald E. Zeglin, Esq.,

Deputy Assistant Attorney General, Office of the General Counsel, to serve this function.

5. All discovery responses shall hereafter be signed by the designated attorney and by the General Counsel of the Veterans Administration, whose signatures shall certify not only the matters required by Rules 11 and 26(g) but shall also constitute a certification that the attorneys have made an inquiry of all documents and files, including computer files, which may contain discoverable material in this action; that they are familiar with the contents of those files; that they have fully distributed all discovery requests so that any employee, unit, or department which may have material relevant to the discovery requests in this case have been apprised; and that the requested discovery has been obtained.

 6. The two attorneys shall present to the court a proposed plan to insure the proper and orderly circulation of and compliance with future discovery requests, the maintenance of a record of discovery and documents provided, and the establishment of a system to supervise the response of employees who are asked to obtain or compile discovery. The court, having received and reviewed the defendant's proposed discovery plan and plaintiffs' objections to it, approves the modified plan as set forth in Appendix I, subject to such further modifications as may be recommended by the special master appointed below.

7. The two attorneys shall also present to the court a proposed notice for posting and circulating to all employees of the Veterans Administration, advising them of the pendency and the nature of this action and, with specificity, notifying them of the issues involved. The court, having received and reviewed the defendant's proposed notice and plaintiffs' objections to it, approves the notice, as modified, as set forth in Appendix II. Within ten days of this written order, the defendant shall post and circulate the notice to all employees.

8. The defendant shall prepare a notice setting forth the obligations of attorneys and litigants, including employees of litigants, in the preservation of evidence, the giving of testimony, and cooperation in pending litigation, so as to avoid unnecessary delay or expense and prevent harassment and other improper conduct eschewed by the Federal Rules of Civil Procedure. The notice shall further advise that adverse action of any kind related to an employee's giving of testimony, evidence, or assistance in this litigation is actionable and may constitute a federal offense, and is further in violation of the orders of this court and may be punished by contempt. The magistrate already assigned to this action, Magistrate Claudia Wilken, is hereby appointed to hear matters related to any complaints arising out of this order. Magistrate Wilken's name and FTS number shall be included in the notice. The court, having received and reviewed the defendant's proposed notice and plaintiffs' objections to it, approves the notice, as modified, as set forth in Appendix III. Within ten days of this written order, the defendant shall post and circulate the notice to all employees.

9. The magistrate is empowered to receive complaints of any violation of this aspect of the order, determine whether any contemptuous conduct has occurred, and make her findings to this court. She is also authorized to determine whether the matter should be referred to an appropriate body for further investigation.

## C. *The Appointment of a Special Master*

10. The discovery abuses found by the court include destruction of documents, incorrect or false responses to discovery requests, and a failure to divulge information and produce documents. Internal procedures for handling discovery and compiling responses were haphazard, making discovery failures inevitable. In addition, there were willful or grossly neglectful efforts that resulted in the destruction of documents. The Veterans Administration has demonstrated that it is either incapable or unwilling to provide discovery in accordance with the federal rules governing discovery. Hence, the court appoints Charles A. Horsky of Washington, D.C., to serve as special master to supervise all further discovery in this matter.

11. While this appointment arises under the sanctions provisions of Rules 11 and 26(g) and the court's inherent powers, the court nonetheless is guided by the provisions of Fed.R.Civ.P. 53. Rule 53(b) provides for the appointment of a special master in those matters where "some exceptional condition requires it." The court is mindful of the admonition of *La Buy v. Howes Leather Co.*, 352 U.S. 249, 259, 77 S.Ct. 309, 315, 1 L.Ed.2d 290, *reh'g denied*, 352 U.S. 1019, 77 S.Ct. 553, 1 L.Ed.2d 560 (1957), that special masters are to be used sparingly and only where the use of the court's time is not justified. Nevertheless, in a post-*La Buy* case, the use of special masters in certain pretrial and discovery proceedings has been upheld. *In re Armco, Inc.*, 770 F.2d 103 (8th Cir.1985). In *Armco* the special master was given "broad authority to supervise and conduct pretrial matters, including discovery activity, the production and arrangement of exhibits and stipulations of fact, the power to hear motions for summary judgment or dismissal and to make recommendations with respect thereto." *Id.* at 105. In this case the powers the court intends to confer are much more limited.

12. Numerous other cases after *La Buy* have approved the appointment of special masters where parties have failed to comply with court orders, displayed intransigence in the litigation, or required close supervision. *See Ruiz v. Estelle*, 679 F.2d 1115, 1159–63 (5th Cir.), *modified on other grounds*, 688 F.2d 266 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Gary W. v. Louisiana*, 601 F.2d 240, 244–45 (5th Cir.1979). Discovery is an area where special masters are frequently appointed either because the problems are complicated or the parties are recalcitrant. *See United States v. American Tel. & Tel. Co.*, 461 F.Supp. 1314, 1348–49 (D.D.C.1978); *Fisher v. Harris, Upham & Co.*, 61 F.R.D. 447, 449 (S.D.N.

Y.1973), *appeal dismissed mem.*, 516 F.2d 896 (2d Cir.1975). Defendant's egregiously sanctionable conduct during the course of discovery in this matter presents a clear case of the exceptional circumstances contemplated by Rule 53 as justifying the appointment of a special master.[5]

13. The special master is appointed for the purpose of monitoring defendant's compliance with its internal plan for meeting discovery requests, as approved by the court above in paragraph 6. He shall review the plan and advise the court in writing if modification is appropriate and necessary at any point during the pretrial proceedings to assure that discovery requests are promptly and accurately satisfied. He shall review periodic reports of internal compliance with the plan and notify the court of any material violations.

14. The special master shall hear and resolve all discovery disputes and submit his findings and conclusions to the court with copies to the parties. He is authorized to meet and confer with the parties to informally resolve discovery disputes. In furtherance of these duties, the special master is empowered to hold conferences, conduct hearings, make a record of such hearings or conferences, and require the parties to submit such papers as are necessary to aid in the resolution of any dispute, including internal documents, manuals, and papers that will assist in reviewing the internal discovery plan.

15. The findings, conclusions, and reports of the special master will be reviewed by the court under the "clearly erroneous" standard set forth in Fed.R.Civ.P. 53(e)(2).

16. The special master shall continue to serve until further order of the court. He shall be allowed his necessary expenses and reasonable fees, as determined by the court, upon submission of a detailed statement setting forth the expenses and hours. Defendant Veterans Administration shall pay such amounts as are approved by the court.

D. *Motion for Reconsideration of the Requirement that Defendant Pay All Fees and Expenses of the Special Master*

 The defendant has moved the court to reconsider its bench ruling that the Veterans Administration pay the entirety of the fees and expenses of the special master, arguing that the sovereign immunity of the United States and its various agencies shields the defendant from the payment of litigation costs absent an express congressional waiver. *See Ruckelshaus v. Sierra Club*, 463 U.S. 680, 684, 103 S.Ct. 3274, 3277, 77 L.Ed.2d 938 (1983); *United States v. Chemical Found., Inc.*, 272 U.S. 1, 20–21, 47 S.Ct. 1, 8, 71 L.Ed. 131 (1926). The V.A. argues that the fees and expenses of a special master are litigation costs, that Congress has not waived sovereign immunity with respect to such costs, and therefore that it cannot be ordered to remuner-

---

5. Further evidence of the need for supervision has recently come to the court's attention by way of an order of the magistrate assigned to this case. The magistrate has found that the defendant virtually ignored for three months its order denying the defendant's motion to limit party discovery and instructing the defendant to produce requested documents from other governmental agencies. The order was issued August 8, 1986, and defendant's motion for reconsideration was denied on September 2, 1986. Plaintiffs brought a motion for contempt and to compel discovery on November 21, 1986. Defendant responded that it had made a good faith effort to respond, asserting that "defendants' counsel did act to provide the agencies identified ... with plaintiffs' document requests in order to comply as quickly as possible with the August 8 order." Defendants' Response Memo-

randum of January 7, 1987, at 20–21. The magistrate's order states that

> [t]he Court is now apprised, and defendants' counsel concede, that *no* steps were taken by defendants' counsel to initiate compliance with the Court's order until early December.... In light of this fact it is clear that this was a case of intentional noncompliance with this Court's order on the part of defendant's counsel, as opposed to a good faith but tardy compliance, as counsel had argued to the Court.... Counsel have compounded their error by providing false and misleading statements to the Court in their memorandum in response to plaintiffs' contempt motion.

Order re Plaintiffs' Motion for Reconsideration and Magistrate's Certificate of Facts Pursuant to 28 U.S.C. § 636(e), filed April 15, 1987, at 3–4 (emphasis in the original).

ate the special master for his work. Defendant asserts that Fed.R.Civ.P. 54(d), which states that "costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law," requires "some source other than Rule 53 ... to justify an award of the expenses of a master. No such source has been identified in the plaintiffs' request for the appointment and compensation of such a master, nor by the Court in its order." Defendant's Response to the Court's January 8, 1987 Oral Order, at 7.

Defendant's argument ignores both the clear legal basis of the court's order and the applicable case authority interpreting the government's immunity with respect to the fees and expenses of a special master. The court has appointed the special master at defendant's expense specifically as a sanction under Rules 11 and 26(g), and under the court's inherent powers to make all necessary orders in protection of its jurisdiction and the integrity of proceedings before it. Under these sanction provisions, the court "has discretion to tailor sanctions to the particular facts of the case." Fed.R.Civ.P. 11 Advisory Committee's Note; *see* Fed.R.Civ.P. 26(g) Advisory Committee's Note ("The nature of the sanction is a matter of judicial discretion to be exercised in light of the particular circumstances.") After considering the V.A.'s repeatedly reckless pretrial conduct and the extraordinary difficulties involved in monitoring such a vast and demonstrably un-

cooperative agency, the court determined that the most effective and appropriate means to sanction the defendant's ongoing abuses was the appointment of a special master, at defendant's expense, to supervise further discovery and assure future compliance.

Far from challenging the court's authority to impose sanctions under Rule 11 against the government, the Veterans Administration has expressly declined to assert its immunity from such sanctions in this proceeding. In the context of its objections to the initial bench order's requirement that the V.A. pay $15,000.00 into a law student extern fund, the defendant stated that "[a]lthough the government does not concede that it can be sanctioned pursuant to Fed.R.Civ.P. 11, plaintiffs correctly note that the government has not contended in this specific proceeding that sovereign immunity prohibits the imposition of Rule 11 sanctions." Defendant's Response to Plaintiffs' Memorandum in Support of Court's Ruling on Rule 11 Sanctions, at n. 2. While the court need not look beyond the V.A.'s waiver of immunity objections to the imposition of Rule 11 sanctions, it is significant to note that other courts have, in fact, found government counsel sanctionable under the provisions of Rule 11. *See, e.g., Larkin v. Heckler,* 584 F.Supp. 512 (N.D.Cal.1984).[6]

Even if the court had assessed the fees and expenses of the special master on

---

**6.** The Ninth Circuit has also relied on other provisions of the Federal Rules of Civil Procedure to levy fees and costs against the government for dilatory conduct. In *Schanen v. United States Dept. of Justice,* 798 F.2d 348 (9th Cir.1986), a Freedom of Information Act case in which the Department of Justice waited until its petition for reconsideration to argue that the release of the disputed information would endanger the lives of its agents and informants, the circuit court reluctantly modified its earlier decision and exempted the information from release. *Id.* at 349. Nonetheless, the court observed that

[i]f the government attorneys had defended this action diligently, much controversy and expense could have been avoided. Rule 60(b) provides that the court may relieve a party from a final judgment 'upon such terms as are

just.' Since it was the government's lack of diligence that prolonged these proceedings, justice demands that [the plaintiff and his counsel] be compensated for their expenses occasioned by the additional proceedings. Therefore, on remand, the district court shall order the government to recompense [plaintiff and his counsel] for their actual and reasonable costs and attorneys' fees attributable to all proceedings following the grant of summary judgment, including proceedings before this court.

*Id.* at 350. There is no reason to conclude that immunity objections would have any greater force with respect to Rule 11 than Rule 60, which evidently is sufficient authorization under *Schanen* for the imposition of fees and costs against the government.

grounds other than the sanction provisions to which the defendant has conceded exposure, its argument would remain without merit. The V.A. has not acknowledged or distinguished the significant case authority specifically establishing the court's ability, outside the context of sanctions, to impose the fees and expenses of a special master upon the government. The Veterans Administration asserts that although the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (1982 & Supp. III 1985), authorizes costs to be awarded against the United States when it fails to prevail in a civil action, sovereign immunity is waived only for those litigation costs specifically enumerated in 28 U.S.C. § 1920 (1982). Since section 1920 does not mention the fees and expenses of a special master, the defendant argues that no express waiver of immunity exists with respect to such costs and thus that the government cannot be ordered to pay them. The defendant cites no authority specifically barring the imposition of special masters' fees and expenses on the government, and the only cases directly on point hold otherwise.

In *Century Inv. Corp. v. United States,* 277 F.2d 247, 254 (9th Cir.1960), this circuit held that the fees and expenses of a special master appointed to compute damages could be charged to the government even though the defendants "engaged in conduct which made it necessary for the government to sue," since the government "misconceived the proper measure of damages" and thus made the master's report unusable. The court specifically held that such fees and expenses were not costs within the meaning of section 2412(a), which at the time excluded the taxing of

any cost against the United States.[7] Since the fees and expenses of a special master thus are not "costs" within the meaning of section 2412, at least where the government is culpably responsible for their imposition, charging such expenses to the government need not be considered in light of immunity limitations possibly raised by section 1920.

Even if the court were to analyze the fees and expenses as costs awarded to a prevailing party under the EAJA, though, the result would be no different. As Chief Judge Justice observed in *Young v. Pierce,* 640 F.Supp. 1476 (E.D.Tex.1986) "the government has been ordered to pay the costs of a special master in a variety of circumstances without an express reference in 28 U.S.C. § 1920." *See, e.g., United States v. Cline,* 388 F.2d 294, 296 (4th Cir.1968) (government ordered to pay half of the costs of a special master appointed in a boundary dispute against the United States); *United States v. American Tel. & Tel. Co.,* 461 F.Supp. at 1348 n. 112 (government ordered to pay half of the costs of a special master appointed to supervise discovery).[8] The court in *Young* observed that the 1966 amendment of the EAJA deleting a provision which exempted the government from liability for costs was intended "to correct the disparity of treatment between parties 'by putting the private litigant and the United States on an equal footing as regards the award of court costs to the prevailing party in litigation involving the government.'" *Young,* at 1491 (citations omitted). In light of this statutory intent, the court rejected the government's sovereign immunity defense

7. Significantly, 28 U.S.C. § 2412(a) was amended in 1966 to delete the provision exempting the government from liability for all costs. *See Young v. Pierce,* 640 F.Supp. 1476 (E.D.Tex. 1986) (LEXIS, Genfed library, Newer file). If the Ninth Circuit held that the fees and expenses of a special master were chargeable to the government prior to the legislative expansion of the United States' liability for litigation costs, the defendant can hardly assert that there is now reason for this court to view the government's immunity more expansively.

8. The fact that the government was ordered to pay half, rather than all, of the special master's fees and expenses in these matters is of no relevance to defendant's sovereign immunity argument. If there is immunity, the court cannot impose any costs; if there is no immunity, the court can impose the entirety of the costs. *See Studiengesellschaft Kohle mbH v. Eastman Kodak Co.,* 713 F.2d 128, 134 (5th Cir.1983).

based on the provisions of 28 U.S.C. § 1920 and accordingly imposed on the government half the fees and expenses of a special master appointed to supervise discovery and monitor the remedy phase of desegregation litigation. *Young*, at 1495.

In light of the case authority rejecting the defendant's contention that sovereign immunity shields it from the payment of the fees and expenses of a special master when it fails to prevail, as it has here, and given the defendant's failure to identify and object to the specific legal basis underlying the court's assessment of fees and expenses against it, the court declines to reconsider its ruling that all reasonable fees and expenses of the special master be charged to the defendant.

ACCORDINGLY, plaintiffs' motion for sanctions is granted and sanctions are imposed pursuant to the terms of this order.

IT IS SO ORDERED.

## APPENDIX I

### DISCOVERY PLAN OF VETERANS ADMINISTRATION

Pursuant to the court's order of January 8, 1987, Donald E. Zeglin, Esq. and Veterans Administration General Counsel Donald L. Ivers hereby submit their "plan for ensuring that discovery requests will be properly circulated and complied with in an orderly manner and a record of discovery provided and documents provided, and a system for doublechecking on employees who are asked to obtain or compile discovery." Transcript of January 8, 1987 Hearing, at 59.

Upon receipt of a discovery request, Mr. Zeglin will distribute a copy of the discovery request to all discovery coordinators designated by the heads of each V.A. department, staff office, and regional office (for those requests specifically designated as applying to regional offices). Each discovery coordinator is to be chosen on the basis of his or her extensive familiarity with and knowledge of the department, staff or regional office's activities, record-keeping capabilities, information-gathering functions, and the physical location of the office's personnel and files, including computer files. The following individuals have been designated as discovery coordinators:

1. David A. Laprade, Department of Veterans Benefits;
2. Jan Stefan J. Donsback, Special Assistant to the Chairman, BVA;
3. Mansell G. Piper, Director of Administration, DM & S;
4. Dean W. Holt, Department of Memorial Affairs;
5. Peter Mulhern, Budget and Finance;
6. Joel Biederman, Personnel and Labor Relations;
7. Raymond E. Hooper, Congressional and Intergovernmental Affairs;
8. Pamela E. Taylor, Public and Consumer Affairs;
9. Frank J. McGuire, Management;
10. Enar H. Sanders, Program Analysis and Evaluation;
11. Allan L. Gohrband, Information Systems and Telecommunications;
12. David M. O'Brien, Information Management and Statistics;
13. Arlyce Dubbin, Logistics;
14. Loretta A. Gray, Administration;
15. Rozetta E. Henderson, Facilities;
16. Jay J. Joerger, Procurement and Supply;
17. Rufus Johnson, Equal Opportunity;
18. Arthur Kyle, Inspector General;
19. Deborah S. Bittinger, Board of Contract Appeals.
20. [add names of regional office coordinators]

Each discovery coordinator is to assist Mr. Zeglin by supervising an orderly search throughout his or her department, regional office or staff office for all discoverable material, by submitting the material to him and by preparing a record of discovery and documents provided. This record will include an index of all material provided, including notations as to which material is provided in response to which requests, the identities of all employees

contacted, and a description of all locations and files searched. This record will be signed by the discovery coordinator and the head of the department, regional office or staff office (or his or her deputy), certifying that all discoverable material has been provided. The record will be forwarded with the discoverable material directly to Mr. Zeglin.

Mr. Zeglin and his staff will examine the documents to determine the adequacy of the discovery production. In addition, the record of discovery will be reviewed by Mrs. Lynn Covington, Director, Paperwork Management and Regulations Service, Office of Information Management and Statistics, with the assistance of her staff, to assist Mr. Zeglin in determining whether all employees, units, and departments that may have material responsive to the discovery requests have been apprised and that requested discovery has been obtained.

As soon as Mr. Zeglin has determined that all discoverable material has been collected, he will prepare and sign the V.A.'s response and present it to Mr. Donald L. Ivers, General Counsel, for his signature. Once signed by Mr. Ivers, the response, indices, and discoverable materials will be forwarded to the Department of Justice for production to the plaintiffs along with the materials collected from other federal agencies, as outlined below.

Mr. Zeglin will forward copies of discovery requests, upon receipt, to other federal agencies when such agencies are specifically designated in the plaintiffs' request. Mr. Zeglin will work with the designated attorney or attorneys responsible for certifying those agencies' discovery responses so as to effect interagency discovery in a timely and coordinated manner. Mr. Zeglin and his staff will collect the discovery responses from the certifying attorneys of other federal agencies and will forward those responses along with the response of the V.A. to the Department of Justice for production to the plaintiffs.

## APPENDIX II
## NOTICE OF PENDING COURT ACTION

The Veterans Administration is a defendant in pending litigation entitled *National Association of Radiation Survivors v. Turnage, et al.* The District Court for the Northern District of California, which is hearing the case, has directed the Veterans Administration to circulate a notice to all employees advising them of the pendency and nature of this action and of the specific issues involved.

The plaintiffs in the litigation claim that they were exposed to ionizing radiation from the atomic bomb tests in the Western United States and the Pacific, or from the atomic bombing of Hiroshima and Nagasaki. These "ionizing radiation claimants" challenge the constitutionality of the $10.00 statutory limitation on the amount of money veterans can pay attorneys for representation in claims against the V.A. for service-connected death and disability benefits. The plaintiffs allege that the statute prevents them from receiving due process and prevents the redress of their grievances under the First Amendment by infringing upon their constitutional right to retain counsel at their own expense.

The court has already certified a class of "Ionizing Radiation Claimants" as plaintiffs in this case. In its decision certifying the class, the court described this litigation as involving one fundamental issue: "whether the fee limitation, as applied to ionizing radiation claimants, violates the due process clause and the First Amendment by precluding them from retaining counsel in connection with their [Service Connected Death and Disability] claims." In addition, the court found several other factual issues to be important for trial. (1) the factual complexity of the underlying Ionizing Radiation Claims; (2) the VA's lack of resources to develop or refusal to develop the facts necessary to establish Ionizing Radiation Claims; (3) the legal complexity of the VA's ionizing radiation regulations and the considerable judgment involved in applying the

law to the facts; (4) the radiogenic nature of the diseases and the lengthy latency periods associated with such diseases; (5) the difficulty of locating and obtaining complete medical records for the claimant's period of service; (6) the almost universal need for expert testimony; (7) the need to refute Defense Nuclear Agency dose reconstructions with testimony from qualified health experts; (8) the inability of service representatives to adequately represent Ionizing Radiation Claimants and claimants' dissatisfaction with the services performed by service representatives; (9) the difficulty of placing veterans at exposure sites due to inadequate DOD record-keeping; (10) obstacles placed by DOD/DNA to make the claims process more difficult, such as the necessity of submitting a FOIA request to obtain a government dose reconstruction; and (11) the existence of physical disabilities that prevent claimants from prosecuting their claims.

The Veterans Administration and the Department of Justice are defending this lawsuit. In the course of preparing for trial, defendants are required to provide to the plaintiffs information and documents concerning these issues of fact in a process called discovery. The court issued a protective order requiring the V.A. to maintain any documents that are relevant to this action, notice of which has already been distributed to you. This notice identifying the issues in this lawsuit should be read in conjunction with the Notice of Discovery Obligations, which sets out the responsibilities of V.A. employees to comply with their discovery obligations, the court order and other orders of the court. If you have any questions concerning how to comply with the court's orders, do not hesitate to contact your supervisor. Your cooperation is essential in ensuring that the Veterans Administration complies with the orders issued by the court. For further information contact [list name and phone number of contact person(s)].

---

Donald L. Ivers
V.A. General Counsel

## APPENDIX III

## NOTICE OF DISCOVERY OBLIGATIONS

### (NARS v. TURNAGE)

In connection with a lawsuit entitled *National Association of Radiation Survivors v. Turnage, et al.*, No. C–83–1861 MHP, the District Court for the Northern District of California has ordered the Veterans Administration to circulate a notice to all employees of the Veterans Administration "setting forth the obligations of attorneys and litigants, including employees of litigants, in the preservation of evidence, the giving of testimony and cooperation in pending litigation, so as to avoid unnecessary delay or expense and prevent harassment and other improper conduct." This order was necessitated by the V.A.'s past failure to comply with its discovery obligations.

## DISCOVERY OBLIGATIONS

This notice should be read in conjunction with the Notice of Pending Court Action, which notifies you of the pendency of litigation concerning V.A. adjudication of service-connected death and disability claims based on alleged exposure to ionizing radiation and the $10.00 attorney fee limitation. If you have custody of any papers that concern this litigation, you should not throw them out until the court has expressly permitted destruction. We will advise you in writing when that occurs. If you have any questions whether papers in your custody or other papers of which you are aware are covered by these instructions, you should seek guidance from your supervisors. They will be able to contact discovery coordinators in their departments or our attorneys to determine the answer to your questions.

The court has ruled that any destruction of papers relevant to this litigation violates the V.A.'s discovery obligations and would subject both the V.A. and you to sanctions, fines or other penalties. You may be

asked to provide papers in order to enable the V.A. to comply with requests from the plaintiffs for such documents. If you are asked to provide such documents, or if you are aware of any request of plaintiffs for papers you have, you should provide them promptly to your supervisor or to the discovery coordinator for your department. You should try to provide your supervisors and the discovery coordinators with as much information as possible so that they can comply with all lawful requests for information. The V.A. attorneys assigned to this case will be required to circulate such requests to ensure that papers called for in the requests are sought from the employees who have the papers, and to institute a system for double-checking to ensure that the papers are received and forwarded to the plaintiffs where appropriate. Compliance with these instructions is therefore important to prevent the V.A. from being held responsible for the destruction and nonproduction of potential evidence.

### RELATED OBLIGATIONS

You are advised that this agency will not tolerate any adverse employment action taken against any person for testifying, participating, or otherwise cooperating in any court proceeding, including this case. This includes demotion, reassignment, transfer, change in responsibilities, verbal or other harassment, and all other adverse actions. The court has ordered the V.A. to inform you that "adverse action of any kind related to an employee's giving of testimony, evidence, or assistance in the litigation is actionable, may constitute a federal offense, and is further in violation of the orders of this court and may be punished by contempt." The court further ordered that this notice advise you that the U.S. Magistrate assigned to this litigation "is empowered to receive complaints of any violation of this aspect of the order." The U.S. Magistrate assigned to this case is Magistrate Claudia Wilkin, U.S. District Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, California, FTS 556-5964.

Donald L. Ivers
V.A. General Counsel